The CHEVY CHASE LAND COMPANY OF MONTGOMERY COUNTY, MARYLAND, Plaintiff,

and

Columbia Country Club, a District of Columbia corporation, Intervenor–Plaintiff,

v.

The UNITED STATES, Defendant,

and

Montgomery County, Maryland, Third-party Defendant.

No. 92–248L.

United States Court of Federal Claims.

March 10, 1997.

As Amended March 19, 1997.

---

William J. Utermohlen, Alexandria, VA, for plaintiff. Maurice J. Montaldi, Washington, D.C., Of Counsel.

R. Dennis Osterman, Bethesda, MD, for Columbia Country Club, Intervenor–Plaintiff.

Andrew M. Eschen, Washington, D.C., with whom was Assistant Attorney General Lois J. Schiffer, for defendant. Evelyn Kitay, Henri F. Rush, Ellen D. Hanson, Office of the General Counsel, Interstate Commerce Commission, Of Counsel.

Diane R. Schwartz Jones, Rockville, MD, for Montgomery County, Maryland, Third-party Defendant.

Andrea C. Ferster, Washington, D.C., for Rails-to-Trails Conservancy, Amicus Curia.

1. U.S. Const. amend V. ("nor shall private property be taken for public use, without just compensation").

2. The Rails-to-Trails Act was enacted on March 28, 1983, as part of the National Trails System Act Amendments of 1983, Pub.L. No. 98–11, Title II, 97 Stat. 42, 48 (codified at 16 U.S.C.

## OPINION

MEROW, Judge.

In this Rails-to-Trails takings case, Plaintiff, the Chevy Chase Land Company ("CCLC" or "the land company"), moved for summary judgment against Defendant, the United States of America and Intervenor-defendant, Montgomery County, Maryland. Both Defendants have tendered cross-motions for summary judgment against Plaintiff, CCLC.

The Columbia Country Club ("the Club" or "CCC") subsequently entered this action as Intervenor-plaintiff and filed a separate motion for summary judgment against all other parties, including Plaintiff, CCLC. Both Plaintiff, CCLC, and Defendant, the United States, countered the Club's motion for summary judgment with cross-motions for summary judgment.

The Rails-to-Trails Conservancy ("the Conservancy") tendered an amicus curiae brief in support of Defendants' takings analysis.

Oral argument ensued.

Upon consideration, it is concluded that: (1) Both Defendants' cross-motions for summary judgment against Plaintiff, CCLC, are granted, and Plaintiff's motion for summary judgment is denied; and (2) Columbia Country Club's motion for summary judgment is denied; the cross-motion for summary judgment tendered by Plaintiff, CCLC, is dismissed for lack of jurisdiction; and Defendant's cross-motion for summary judgment against the Club is granted.

## I. BACKGROUND

### A. Introduction

Plaintiffs have alleged a taking pursuant to the Fifth Amendment of the Constitution [1] resulting from actions taken pursuant to federal legislation known as the Rails-to-Trails Act (the "Act"),[2] 16 U.S.C. § 1247(d).

§ 1247(d) (1994)). The amendments were appended to the National Trails System Act of October 2, 1968, Pub.L. No. 90–543, 82 Stat. 919 (codified as amended at 16 U.S.C. §§ 1241–51 (1994)).

The taking alleged involves a strip of land approximately one mile long, and 100–feet wide, spanning some 12 acres in Montgomery County, Maryland. The land company conveyed this parcel, termed a railroad "right-of-way,"[3] to the Metropolitan Southern Railroad ("MSRR") by deed in 1911. MSRR operated a railroad on this right-of-way up through May 10, 1985.

On April 9, 1986 application was made pursuant to Interstate Commerce Commission ("ICC") regulations for authorization to abandon rail service on the line. See 49 CFR 1152.22. The ICC entered a decision on February 25, 1988 permitting abandonment on condition that the railroad maintain the right-of-way for a period of 180 days to enable the acquisition of the right-of-way for public use pursuant to the Rails-to-Trails Act. During this period Montgomery County came forward as a potential purchaser, seeking to use the land for a light-rail system as well as a hiker/biker path within the constraints of 16 U.S.C. § 1247(d), and to postpone abandonment of the railroad corridor. On December 14, 1988[4] the ICC approved the purchase and transfer of use and issued a Certificate of Interim Trail Use ("CITU") pursuant to the Act. The right-of-way property was then conveyed to Montgomery County by quitclaim deed for consideration of $10 million.[5] As a result of the ICC's actions pursuant to the Rails-to-Trails Act, ICC abandonment of the railroad right-of-way was delayed indefinitely.

## B. ARGUMENTS

The land company initiated the instant takings action in 1992, asserting that it owns the right-of-way strip and that postponement of the railroad's abandonment of the right-of-way obstructed its full fee simple absolute property interest in this strip. CCLC's takings argument has three dependent components. First, CCLC contends that it had

originally conveyed the parcel to MSRR as an easement for the purpose of operating a railroad, and that CCLC retained title to this strip in fee simple absolute during the time MSRR used it for railroad operations. Second, CCLC asserts that MSRR's termination of railroad service caused the railroad easement to lapse and, as a result, a reversion occurred and CCLC now possesses unencumbered title. Third, the land company maintains that the ICC's authorization of Montgomery County's purchase of the right-of-way effected a Fifth Amendment taking of its property, because the federal regulatory sanction of the County's use constitutes a physical and regulatory invasion and causes an expansion in scope of the original railroad easement.

Defendants, the United States and Montgomery County, assert that CCLC actually conveyed the right-of-way to MSRR in fee simple absolute. By doing so, they maintain, the land company fully relinquished its title and any interest it had in the land at issue back in 1911, the date of conveyance. As a result, CCLC had no interest in the land in 1988, when the CITU issued. Accepting this formulation, CCLC's other arguments need not be considered. Defendants proceed to assert alternatively that even had the 1911 deed conveyed only an easement to MSRR, the easement never lapsed, because neither the railroad nor Montgomery County had abandoned it, as a matter of law. Defendants contend that even had the easement been abandoned, no Fifth Amendment taking has occurred because CCLC held no compensable expectancy to a reversion due to the highly regulated nature of the railroads.

On summary judgment, Intervenor-plaintiff, the Columbia Country Club, asserts that it, too, has suffered a taking of its property within the right-of-way. The Club claims to have interests in a portion of the 100–foot wide strip extending some 1,686 feet and

---

3. This term has two meanings, one referring to a right to use certain land for railroad purposes—which constitutes an easement, and the other referring to the actual land used by the railroad. See infra at 568.

4. The ICC extended the 180–day time period as per the parties' requests.

5. A quitclaim deed "... purports merely to convey whatever title to the particular land the grantor may have, and its use excludes any implication that [the grantee] has a good title, or any title at all." 4 H. Tiffany, The Law of Property § 959 (3d ed. 1939).

totalling approximately 3.89 acres. The Club alleges that it used this property as part of its golf course. The Club asserts that it acquired fee simple absolute title to the majority of these 3.89 acres by adverse possession. The Club also contends that it has certain easements within the railroad corridor. The introduction of a hiker/biker trail, as well as a highly-trafficked light-rail system pursuant to the Rails-to-Trails Act, the Club maintains, will effect a taking of the property in which it has an interest within the right-of-way, as well as that within its surrounding golf club.

All other parties oppose the Club's position, stating that the Club has acquired neither fee simple absolute, nor a lesser property interest of an easement in the strip, because the Club enjoyed permissive use. Even if the Club had a property interest in the strip, Plaintiff and Defendants assert that no taking may have occurred because the Club had no reason or right to expect that use of the railroad right-of-way would continue exactly as it existed in the early part of this century, when the Club obtained the land for its golf course.

### C. Railroad Regulatory Framework

Prior to 1920, the Maryland legislature regulated all railroad transactions within the state. Regulatory oversight commenced with the railroad's legislative charter or certificate of incorporation which proscribed the railroad's authorized uses of its right-of-way. *See Public Service Comm'n of Maryland v. Phila., B. & W.R. Co.*, 122 Md. 438, 89 A. 726 (1914) (hereinafter *"PSC of Md."*); 1870 Md. Laws ch. 476 (requirement for legislative charter removed; incorporation permitted pursuant to provisions of act). Various legislation further limited railroads' actions. *See e.g.* 1870 Md. Laws ch. 362 (taxes); 1874 Md. Laws ch. 446 (train passage over connecting railroads); 1870 Md. Laws ch. 476 (for the "creation and regulation" of incorporated railroad companies). In 1910, Maryland enacted legislation establishing a state administrative agency, called the Public Service Commission, to regulate railroad transactions. *See* 1910 Md.Laws ch. 180, § 26 ("No common carrier, railroad corporation, or

street railroad corporation shall ... exercise any franchise or right under any provision of the railroad law, or of any other law not heretofore lawfully exercised, without first having obtained the permission and approval of the commission.") This provision specifically applied to abandonment. *See* 1914 Md. Laws ch. 445, § 1, *cited in Benson v. Maloy*, 141 Md. 398, 118 A. 852, 854 (1922) ("The provisions ... empowering the commission to grant such permission and approval ... after due hearing ... shall likewise apply to the abandonment or discontinuance in whole or in part by any common carrier, railroad corporation....") (emphasis added).

From 1920 forward, the federal government has retained exclusive jurisdiction over the interstate operation of this nation's railroads beginning with the enactment of the Transportation Act of 1920 ("1920 Act"). This Act granted the ICC exclusive and plenary jurisdiction over abandonment, construction and operation of the nation's interstate railroad lines. *See Transit Comm'n v. United States*, 289 U.S. 121, 127, 53 S.Ct. 536, 538, 77 L.Ed. 1075 (1933). The 1920 Act provided,

(18) ... no carrier by railroad subject to this Act shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment.

Transportation Act of 1920, Ch. 91 tit. IV, Sec. 402, § 1(18), 41 Stat. 474, 477–78 (1920).

The abandonment provision of the 1920 Act was reformulated in 1976 as part of the Rail Revitalization and Regulatory Reform Act. Pub.L. No. 94–210 tit. VIII, § 802, 90 Stat. 125, 127–130 (1976) (codified as amended at 49 U.S.C. § 10903). Under this legislation abandonment or discontinuance of a railroad line was subject to an ICC finding that "... the present or future public convenience and necessity require[d] or permit[ted] ..." such act. 49 U.S.C. § 10903(d). An order authorizing abandonment allowed a carrier to terminate service on a line, and the line, at that point, was no longer part of the national rail transportation system. 49 U.S.C.

§ 10903(b)(1); *Preseault v. ICC,* 494 U.S. 1, 5–6 n. 3, 110 S.Ct. 914, 918–19 n. 3, 108 L.Ed.2d 1 (1990). Discontinuance, in contrast, allowed a rail carrier to cease active operations on its line for an indefinite period without departing from ICC jurisdiction and the national rail transportation system. *Id.* The 1976 Act's discontinuance provisions also provided for the ICC to delay a railroad's disposition of lines proposed for abandonment for 180 days after issuance of an ICC abandonment decision. 49 U.S.C. § 10906.

In 1983, Congress enacted the Rails-to-Trails Act, which added section 8(d) to the National Trails System Act. *See supra* n. 2. Pub.L. No. 98–11, § 208, 97 Stat. 42, 48 (1983) (codified at 16 U.S.C. § 1247(d) (1988) ("the Rails-to-Trails Act")). One of the purposes of this amendment was the preservation of established railroad rights-of-way for reactivation in the future. The provision provides in part,

> "... in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service ... in the case of interim use of any established railroad rights-of-way ... such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such right-of-way for railroad purposes. **If a State, political subdivision, or qualified private organization is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way, then the Commission shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use"** (emphasis added).

By enacting this section, Congress provided that potential interim trail use would be considered prior to abandonment of rail lines, and that such use would not constitute abandonment under state law.

Under the regulations which implement the 1983 Rails-to-Trails Act, the ICC was to issue a Certificate of Interim Trail Use (CITU) to allow a carrier to negotiate an agreement with a public or private organization willing to assume responsibility for the right-of-way, and under circumstances where "the public convenience and necessity permit abandonment." 49 C.F.R. § 1152.29(b)(1)(ii). If an agreement was reached, section 1247(d) treated interim trail use as a discontinuance which preserved ICC jurisdiction over the right-of-way, rather than an abandonment which would terminate ICC jurisdiction and cause any right-of-way held as an easement to revert to the owner of the underlying estate in fee simple. During the interim, the rail corridor was to be held in a national "rail bank," subject to ICC control, for future rail use.[6]

## D. Historical Context of Right-of-Way Conveyance

Plaintiff's Fifth Amendment taking claim with respect to the right-of-way is premised upon the following facts. Plaintiff, the Chevy Chase Land Company, incorporated on June 6, 1890 under the direction of Francis G. Newlands, a developer who would subsequently become a United States Representative and then Senator from Nevada.[7] Newlands established the CCLC as a vehicle to develop a neighborhood situated on either side of the District of Columbia's northwestern border which would come to be known as Chevy Chase. By 1890, Newlands' land company had amassed some 1712 acres of land for this planned community.

CCLC was but one of Newlands' development projects. Prior to and throughout his tenure in Congress, Newlands spearheaded

---

6. Congress subsequently passed the ICC Termination Act of 1995, Pub.L. No. 104–88, 109 Stat. 803, which recodified the ICC's responsibilities concerning abandonments and discontinuances and transferred those responsibilities to a newly created Surface Transportation Board. The Act, which has a savings clause for suits initiated

before December 29, 1995, is not applicable to the case at bar.

7. Newlands served in Congress from 1893 until his death in 1917.

the planning and development of several residential communities throughout the country.[8] As a member of the House Ways and Means Committee and the Senate Committee on Interstate Commerce, he worked on the development of an interstate transportation network to facilitate the development of his projects.

To provide access to Chevy Chase, Newlands and CCLC forged relationships with several railroad companies, including the MSRR. In 1890, MSRR incorporated and acquired the right to run a railroad on the Maryland portion of an approximately seven-mile B & O spur line known as "the Georgetown Branch." MSRR incorporated in 1890, and subsequently became a subsidiary of the Baltimore and Ohio Railroad ("B & O"), which was owned by the Chessie System Railroads, a unit of CSX Corporation.[9] The spur line departed the main B & O line just northwest of Silver Spring (at "Georgetown Junction" or "Linden Station"), and extended across Montgomery County, Maryland to the District of Columbia boundary at a point near the Potomac River. The line then ran along the Potomac into Georgetown. About a mile of the line traversed CCLC property, on either side of Connecticut Avenue, near Chevy Chase Lake and just north of the endpoint of the Rock Creek Railroad.

On March 4, 1891, the land company adopted a resolution deeming it "... advisable and to be for the benefit ..." of the company to have this [MSRR] railroad line cross its property. Accordingly, on April 21, 1891, the land company and MSRR executed a Memorandum of Agreement ("1891 Agreement") proposing a conveyance of real property to the latter for the contemplated railroad.[10] It provided,

> [T]he Metropolitan Southern Railroad Company contemplating the construction of a line of road in connection with its Metropolitan Branch, to be known as the Metropolitan Southern Railroad, to traverse certain lands, the property of the Chevy Chase Land Company, as hereinafter appearing, the said Chevy Chase Land Company **in consideration of the agreement of the said railroad company hereinafter set forth,** agrees to donate and convey a right of way 100 feet wide.... And the said Land Company for the consideration aforesaid further agrees to donate and convey to the said Railroad Company for the purposes of a passenger and freight depot, and uses incident thereto, including side tracking, the following described parcel of land, designated for the purposes of this agreement as Parcel A ..., containing 0.9 acres more or less.
>
> * * * * * *
>
> **And in consideration of the aforesaid agreement of the said Land Company, the said Railroad Company agrees to erect upon the said parcel "A" a passenger station, to cost not less than $4,000** or to contribute the sum of $4,000 towards the erection by said Land Company of such passenger station on said parcel "A" and also the said railroad Company, for the consideration aforesaid, agrees to give said Land Company the right to connect its power house or power houses by a siding or sidings to said railroad Company's tracks....

1891 Agreement (emphasis added).

According to the 1891 Agreement, MSRR would construct its "tracks from the Metropolitan Branch [of B & O railroad in Silver Spring] ... to Connecticut Avenue extended from the District of Columbia, on or before the 31st day of August, 1891." MSRR also promised to give the land company the right to connect power houses by sidings to MSRR's tracks. On the same day the 1891 Agreement was executed, the parties execut-

---

8. See generally, Albert W. Atwood, Francis G. Newlands: A Builder of the Nation, (1969), p. 29–39.

9. A July 1, 1909 Agreement memorialized the relationship between the two railroad companies. MC S.J.Mot. Exh. 26 (B & O "is the owner of the entire capital stock of [MSRR] and said railroad has been operated and managed for a number of years past as a part of the Baltimore and Ohio Railroad....").

10. As an incorporated railroad MSRR possessed the authority to condemn the land for its railway, and actually acquired much of it through the exercise of its condemnation power. See FDA 114–126.

ed a separate agreement in which MSRR granted CCLC half-price rates on its transportation of railroad freight on the Georgetown Branch.

By 1892 MSRR had completed part of the line, from Georgetown to Chevy Chase Lake. Building then ceased and MSRR eventually completed the line and commenced service in 1910.

MSRR never built the depot contemplated by the 1891 Agreement, deciding instead to construct a freight siding on the depot tract. During the interim, the Rock Creek Railroad built a passenger depot just to the south of the tract apportioned for the depot in the 1891 Agreement.

After construction of the railroad had been completed in 1910, the land company and the railroad revised their original agreement and the land company conveyed the right-of-way by a 1911 deed. A letter of December 20, 1910 from a land company official [11] to one Mr. J.D. McCubbin, Jr. of the B & O referenced this agreement. The letter provided,

I have had a long talk with Senator Newlands, President of the Chevy Chase Land Company, and have succeeded in getting his consent to the arrangement suggested by you sometime during the past summer.

This arrangement was that the Baltimore and Ohio Railroad pay to the Chevy Chase Land Company Four Thousand Dollars in cash, and in consideration of this payment, have conveyed to it, all the property covered by its right of way contract with the Land Company, entered into some years ago, the building of a Passenger Station as required by said contract, to be waived by reason of the Four Thousand Dollar payment above referred to.

The parties then executed a deed on March 22, 1911, which they would record on April 4, 1911. The granting clause stated,

... the said party of the first part [the land company] for and in consideration of the sum of FOUR THOUSAND (4,000) DOLLARS, to it paid by the said party of the second part, does hereby grant and convey unto the said party of the second

part [MSRR], its successors and assigns, a free and perpetual right of way, one hundred (100) feet wide, over the land and premises hereinafter designated as "Parcel A" and does hereby grant and convey unto the said party of the second part [MSRR], its successors and assigns, in fee—simple, the land and premises, hereinafter designated as "Parcel B"....

The right-of-way, or Parcel, A in the deed, was described by metes and bounds, and was summarized as a "... parcel being a strip of land fifty (50) feet wide on each side of the center line of the Metropolitan Southern Railroad through the land of the Chevy Chase Land Company...." Parcel B was described by metes and bounds as well.

The deed's warranty clause stated,

AND the said party hereto of the first part hereby covenants to warrant specially the property hereby conveyed, and to execute such further assurances of said land as may be requisite.

Additionally, the deed provided that upon its signing the April 21, 1891 Memorandum of Agreement would be void and that the parties' full agreement would be embodied within the deed. It stated,

... the contract and agreement entered into on the Twenty-first day of April, 1891 ... is mutually abrogated, canceled and set aside, and [MSRR], is hereby released and discharged from the obligation set forth in said contract, of erecting a passenger station to cost not less than Four Thousand (4,000) Dollars, or of contributing the sum of Four Thousand (4,000) Dollars toward the erection by the said [CCLC], of a passenger station on the hereinbefore described parcel of land designated as Parcel "B"; and the said [MSRR], as is evidenced by its acceptance of this conveyance, hereby releases [CCLC], from any obligation ... to erect or cause to be erected the passenger station aforesaid.

The only reference to a restriction on MSRR's use of the parcel comes at the end of a paragraph delineating its metes and

---

11. The letter was on land company stationery and was unsigned.

bounds. It states that use was "[s]ubject to [an] existing right of way for highway and other purposes over what is known as Connecticut Avenue Extended."

## E. CCLC's Additional Railroad Ventures

Before the land company had incorporated and during the years ensuing from 1891 until the Georgetown Branch became operational, Newlands and CCLC had begun arrangements for additional railroad access to Chevy Chase. Newlands was instrumental in the establishment of the Rock Creek Railway Company of the District of Columbia ("Rock Creek RR") trolley line, which ran from the downtown area of the District of Columbia, and up Connecticut Avenue to Chevy Chase. Newlands became its president and acquired a controlling interest in the line in 1890. CCLC and the Rock Creek company owned and operated this line as a joint venture which became operational in September, 1892. Although CCLC conveyed its interest in the railway to Rock Creek RR in December, 1892, it continued to depend closely upon the trolley line for transporting residents to and from the new community.[12]

Next, on November 8, 1894, the Land Company executed a deed to the Chevy Chase and Kensington Electric Railway Company of Montgomery County, Maryland conveying a limited right for railroad use of CCLC's land. The lease contained specific provisions concerning how the land would be used and directing that the right-of-way would lapse in the event the property were not used for railway purposes. The language of the deed provided,

> [the land company] for consideration of Five Dollars ... conveyed ... unto the said [railroad company] its successors and assigns a right of way over.... A strip of land 25 feet wide ... subject to the following provisos, limitations and conditions. The said [railroad company] shall construct and complete and commence regularly operating within nine months hereafter an electric railway.... [I]f the said [railroad company] ... shall thereafter fail to con-

tinuously operate said railway as an electric railway the interest of the said [railroad company] in the right of way hereby conveyed shall at once cease and determine and the same shall therefrom revert to [the Land Company], its successors and assigns....

FDA at 5–7.

On April 14, 1896, CCLC executed a deed to the Glen Echo Railroad Company of Montgomery County, Maryland, similarly containing specific conditions limiting the usage of the land and providing for reversion in case the railway failed to meet those conditions. In the deed CCLC discussed the conveyance of "... a right of way for the purpose of constructing and operating the railroad...." FDA at 8–12 (emphasis added). It further provided, "the said right of way shall only be used and occupied by the said railroad company as a right of way for an Electric railroad, and for no other purpose or service whatsoever...." *Id.* Additionally, the consideration for this exchange stated by the railway was one dollar plus the agreement that all of the "actual residents located along the right of way" would be able to ride the railroad for free. *Id.*

CCLC arranged for and granted interests in its land to entities other than railroads, as well, while instituting conditions for reversions and preserving the underlying fee simple estate. On November 2, 1892, the land company filed conditions for the dedication of land for public roads and parks with the Clerk for the Circuit Court of Maryland. Again, on July 18, 1896, the Land Company dedicated land to the Board of County School Commissioners of Montgomery County for the construction of a schoolhouse, containing specific provisions restricting the usage of the property to a schoolhouse, and that the failure to maintain a school on the land would forfeit the interest and cause a reversion to the land company.

## F. Span of MSRR Line Use

From 1911 through 1985, MSRR and its successors and assigns have used and con-

---

12. In 1895 Rock Creek RR merged with the Washington and Georgetown Railroad Company creating the Capital Traction Company.

trolled the right-of-way. Rail operations fluctuated throughout the railroad's life from 1911 until 1985. By the early 1980's, use had decreased to an average of two trains per week. Over the years, the railroad was used primarily for hauling freight, and for occasional site-seeing excursions as well as for the transport of troops during the Korean War.[13]

During MSRR's operational period, CCLC leased portions of the right-of-way from CSX, MSRR's parent corporation. On November 15, 1973, the Land Company leased for an annual rent of $50 plus reimbursement of all taxes assessed upon a "rectangularly shaped parcel of land containing . . . approximately 10,304 square feet, situated south of Lessor's track and east of Connecticut Avenue." The lease provided that "Lessee [CCLC] shall not at any time own or claim any right, title or interest in or to the premises." By 1982, CSX indicated that it would increase the rent. In response, on June 30, 1982, the land company offered to pay $50 per month plus "any real estate taxes that might be levied on this property." On August 2, 1982, the land company agreed to increase its payments from $50 per year to $750 per year and otherwise keep the original lease intact.

The parties executed an additional agreement on November 15, 1973 providing that CCLC would obtain a private pedestrian crossing agreement "for the purpose of ingress and egress to Licensee's office building." Again, the land company was denominated as the "licensee" in the agreement.

Over these years, CCLC was not assessed and did not pay any property taxes on the strip of land at issue in this case. Nor did it ever list Parcel A as a corporate asset in its financial reports.

In the early 1980's, the railroad took several actions to indicate that service would be terminated upon the Georgetown Branch. In 1983 the railroad posted notice on lines of a future intent to abandon within three years. (At the time only two entities still were using the railroad for the hauling of

freight.) On August 13, 1984, an internal memorandum was circulated within the railroad which provided that the Georgetown Branch would be abandoned and that plans for bridgework would be abandoned. In 1985, CSX terminated operations on the Georgetown Branch, due to the need for major repairs to a railroad trestle over Rock Creek. Subsequent to resolving to seek federal regulatory permission to abandon their rail line, on April 9, 1986, MSSR and B & O, as part of the CSX corporation, filed an application with the ICC, seeking to abandon their common carrier obligation to maintain the Georgetown Branch.

On February 25, 1988, the ICC issued a decision finding abandonment of the line appropriate should no offer for continued rail operations be received, and to allow CSX a period of 180 days to enter into negotiations with the government of Montgomery County for a transfer of the Maryland portion of the Georgetown Branch pursuant to 16 U.S.C. § 1247. Within the decision, the ICC acknowledged that use of the line had declined 91.1% from 1969 through 1985. *See generally* Plaintiff's Appendix at A–112–125, ICC Docket No. AB–19 (Sub–No. 112), February 25, 1988. ["A–__"]. The ICC also noted that there were two remaining users of the railroad in 1985, and that both had contracted with CSX to receive their deliveries by truck. *Id.* Further, it indicated that repair of the railroad alone would cost some $573,000. *Id.*

On November 22, 1988, Montgomery County and CSX reached an agreement. The ICC then issued a Certificate of Interim Trails Use "CITU" on December 14, 1988 permitting Montgomery County's proposed uses of the rail corridor pursuant to 16 U.S.C. § 1247(d). As contemplated by the CITU, CSX and subsidiaries conveyed the Maryland portion of the Georgetown Branch to Montgomery County by quitclaim deed on December 16, 1988 for $10 million.

The County submitted its Georgetown Branch Light Rail Feasibility Study—its plan to institute a combined recreational trail

**13.** See Herbert H. Harwood, Jr., Impossible Challenge—The Baltimore and Ohio Railroad in

Maryland (1979) at 334.

and light railroad over the strip of land at issue—to the Maryland Legislature in January, 1989, which was adopted in November 1989. By 1990, the State of Maryland agreed to contribute up to $70 million for construction of the project. As of January 1991, the State estimated that the trolley would cost $183.2 million. The parties have indicated that the proposed combined project has not yet been fully implemented.

### G. Columbia Country Club's Relationship With the Right–of–Way

The Club's takings claim stems from the following facts. In summer 1909, the Club [14] chose two parcels of land in Chevy Chase, one measuring 39.311 and another 89.459 acres, totalling 128.77 acres combined, as the site for a clubhouse and golf course. The two parcels were located to the north and south of the 100–foot wide right-of-way at issue in this case, and were owned by CCLC at the time. However, MSRR was already in possession of the right-of-way pursuant to the 1891 Agreement. MSRR would, as stated above, receive a deed from CCLC conveying this right-of-way in 1911.

As the land the Club sought to purchase would be bisected by MSRR's right-of-way, on June 26, 1909 the Club entered into what appears to be an option contract with CCLC which conditioned the sale of the two parcels upon the Club's ability to obtain permission from B & O Railroad (MSRR's parent company) to cross MSRR's tracks. Plaintiff's Supplemental Appendix at 51 ("SA–__"). The parties located among CCLC's records an undated document referring to this agreement. It provides,

All the conditions of the option dated June 26, 1909, given by F.G. Newlands, President, Chevy Chase Land Company, to Columbia Golf Club, to be carried out unless changed by this contract. The sale is made on condition **that permission can be obtained by the Columbia Golf Club from the Baltimore & Ohio Railroad Company to cross its tracks which run through the property covered by this**

contract which is necessary to make the property valuable for a Golf Course.

SA–51 (emphasis added).

The Club contends that "Senator Newlands, [then] President of the CCLC, advised [the Club] to secure the right to cross over the right-of-way so that [the Club] could build its golf course and the CCLC could sell the land to [the Club] for such purpose." Columbia Country Club's Proposed Findings of Uncontroverted Facts, *citing* Club Brief Appendix at 6, 26 ("CBA–__").[15]

On November 11, 1909, the Club and MSRR executed such an agreement. It provided,

WHEREAS, the said Columbia Country Club is the owner of certain land situated near Chevy Chase, in the County of Montgomery, State of Maryland, and contemplates the location and maintenance on a portion thereof of a golf course,

AND WHEREAS, the said Metropolitan Southern Railroad owns and maintains a right-of-way, road-bed and track running through and across the said land of the said Columbia Country Club,

AND WHEREAS, the said Columbia Country Club is desirous of obtaining and securing from the said Metropolitan Southern Railroad Company a permission, license or privilege for the members and guests of said Columbia Country Club and caddies and servants in the employment of said members and guests, and other agents and employees of said Club, to go upon, over and across the said right-of-way, road-bed and tracks of said Metropolitan Southern Railroad Company during the day time, and at such points thereon as may be hereafter agreed upon by the parties hereto in writing.

NOW THIS AGREEMENT WITNESSETH, that for and in consideration of the payment of Five Dollars to the said Columbia Country Club by the Metropolitan Southern Railroad Company, and the grant by said Metropolitan Southern Rail-

---

14. Formerly known as the Columbia Golf Club, the Columbia Country Club incorporated under this new name on August 25, 1909.

15. The Club has not produced evidence of Mr. Newlands' so advising the Club.

road Company unto the said Columbia Country Club of the permission, license and privilege hereinbefore set forth, the said Columbia Country Club will, and does hereby, assume all risk of loss, damage or injury to its members, guests, caddies or employees, as hereinbefore described, while using, crossing or upon said right-of-way, road-bed or tracks of the said Metropolitan Southern Railroad Company, and hereby releases the said Metropolitan, its successors and assigns, from all claim from loss, damage or injuries sustained by said Columbia Country Club, its employees, guests, or the caddies or servants employed by said Columbia Country Club, or its guests, whether caused by the negligence of said Metropolitan Southern Railroad Company, its agents, employees or otherwise, and the said Columbia Country Club does hereby covenant to save harmless and indemnify the said Metropolitan Southern Railroad Company, from and against all claims, or demands, costs and expenses of any kind by reason of any accident, injury, damage or loss of life to its members or guests, or their caddies or employees whatsoever, which may arise in any way from the use or crossing of said right-of-way, road-bed or tracks, or through the negligence, carelessness or other acts of the said Columbia Country Club, its officers, agents, guests, caddies or employees.

1909 Agreement, CBA–27, 28 (emphasis added).

After this agreement had been signed, on November 22, 1909, CCLC conveyed the two parcels of land to the Club. The deed provided,

> ... the land and premises hereby conveyed shall only be used for the purpose of a Golf Course and Club grounds, ... [and CCLC] hereby covenants to warrant specially the property hereby conveyed, and to execute such further assurances of said land as may be requisite.

*Id.* at 34. The deed was recorded among the land records of Montgomery County.

The Club opened its golf course on these two parcels in January 1911. A few years later, in 1913, CCLC conveyed additional smaller parcels to the Club situated adjacent to the parcels conveyed in 1909. On November 24, 1913, yet another four parcels were conveyed totalling 4.138 acres. Montgomery County Opp'n to Club S.J. Mot. Exh. A–1. ["MC Opp. Exh. ___"].

The Club's board of governors minutes from 1914 reflect that one "Dr. Harban [a board member] was authorized to enter into arrangements with the officials of the B. & O. R.R., for the purpose of securing right of way across their tracks, with the understanding that the R.R. Co. would not be held liable for any ... accidents that might occur." Federal Defendant's Appendix 128–30, Minutes of May 20, 1914.

The Club obtained additional parcels from CCLC in later years. By deed dated October 29, 1919, CCLC conveyed to it an additional parcel of approximately three-fourths of an acre. On July 3, 1940 the Club obtained three additional small parcels from CCLC which also bordered upon the right-of-way. CBA–1, 36; SA–64. By 1940, the Club had acquired a total of approximately 145.35 acres, its current landholding.

At present, there are four paths crossing the tracks on the right-of-way. Two of them were created to connect the two large parcels comprising the original golf course. The other two—both located to the west of Tee # 2—were created subsequent to 1940, when the Club acquired additional parcels west of Tee # 2 and lying to the north of the tracks, to connect existing portions with the newly acquired portions of the course. *See* SA–64–66, July 1940 Deed (conveyance of Parcel B north of the tracks and west of the land conveyed in 1909); CBA–36 (1940 conveyance labeled as Parcel B and Liber 792 folio 001). Club affidavits attest that one of these post–1940 crossings has been in use since approximately 1962, *see* CBA–36, CBA–43, and that Club members remember the use of all three other crossings since the 1930's. *See* CBA–73–74, Gott Affid.; CBA–69–70 West Affid.; CBA–49–50.

The Club's proffered affidavits contain statements from members, employees and surveyors attesting to the veracity of its survey map and indicate that the members,

guests, agents and employees of the Club have utilized these crossings as well as other parts of the 100–foot right-of-way. *See* CBA–43 (Mr. Budd); CBA–46 (Mr. Robinson); CBA–49 (Mr. Walker); CBA–65 (Mr. Davis); CBA–69 (Mr. West). The Club's asserted uses of the right-of-way include: (1) walking and riding golf carts upon the crossing paths over the tracks and upon the adjacent land; (2) Club employees' landscaping, spraying foliage and trimming brush, grass and weeds along and upon the right-of-way; CBA–43, CBA–36, and (3) the extension and placing of tees and greens within the right-of-way. CBA–49, CBA–36; SA–17, Farr Affid. ¶ 10.

Throughout the years, the Club has not been assessed or paid property taxes on any portion of the right-of-way. SA–24, Club Int. Answer No. 9; MC Opp. Exh. 1, 2 (county tax valuation maps 1919 and 1967).

In the early 1980's, Club counsel wrote to CSX apparently seeking another agreement concerning the Club's use of the right-of-way. In a 1982 letter counsel referred to a meeting between Club counsel and CSX and also made reference to the uncovering of the 1909 agreement. The letter provides,

> This has reference to Mr. Spencer's meeting with Mr. Trotman [Club counsel] on June 29 and your telephone conversation with Mr. Spencer on July 2 concerning Railroad property being used by members and guests of the Columbia Country Club at Chevy Chase, Maryland.
>
> Upon further research of our corporate records, Mr. Spencer located an old agreement dated November 11, 1909 between the B & O and the Columbia Country Club. In view of this agreement, a new one will be unnecessary.

MC Opp. Exh. 4, July 8, 1982 Letter from J. Trotman to CSX.

In the mid–1980's, at approximately the same time that MSRR and B & O had expressed an intent to petition for abandonment or discontinuance of rail service upon the right-of-way, the Club attempted to secure continued passage over the right-of-way. In 1986 counsel for the Club initiated contact with CCLC and CSX inquiring as to the nature of the ownership of property rights on the right-of-way.

In February 1986 counsel wrote to CCLC, [i]t is conceivable that the right of reverter would return the property to the Chevy Chase Land Company in the event that the railroad abandons its right-of-way.

SA–21, February 19, 1986 letter from K.W. Parkinson to CCLC.

Again, in August 1986, apparently under the belief that CCLC had title to the right-of-way, counsel for the Club wrote to CCLC requesting "to acquire ... its right of reverter for that portion of the right-of-way which transits the Club property." SA–20, Aug. 11, 1986 letter from K.W. Parkinson to CCLC. CCLC counsel asserts that Club counsel had been in contact with the land company "over a period of a year to eighteen months," around this time and that Club counsel never suggested that the Club had any title interest in the right-of-way whether by adverse possession or otherwise. SA–18–19, Farr Affid.

Additionally, in April 1986 Club counsel wrote to CSX:

> [W]e ... are very much concerned about the rights of the parties related to the railroad right-of-way through the golf course.... We would like to explore all avenues so as to protect the beautiful golf course at the Club. As far as I know, the relationship between the railroad and the Club has always been friendly and mutually supportive [sic] throughout its long 76 year history.

MC Opp. Exh. 5, April 18, 1986 letter from K.W. Parkinson to CSX.

Montgomery County's planned light-rail and hiker/biker trail will traverse the right-of-way running through the Club's golf course and will require the Club to relocate certain tees, holes and greens. In the Maryland Department of Transportation Evaluation Report on the Montgomery County Georgetown Branch Trolley/Trail Project of January 15, 1991, the county provides that "[w]ithin the Country Club, the vertical alignment of the trolley will be raised approximately five feet to provide for golf cart underpasses which allows for movement between the greens north and south of the

alignment." The report also provides, "[o]n the eastern edge of the Country Club, the tournament tee at holes Nos. 15 & 18, which are within the existing railroad ROW (right-of-way), must be relocated or abandoned. Greens at holes 14 & 17 must also be modified."

## II. STANDARD OF REVIEW

All four parties in the instant case have moved for summary judgment, each asserting that there are no material issues of fact genuinely in dispute with regard to whether a taking with respect to CCLC or the Club has occurred. Each concludes that judgment is thus appropriate as a matter of law.

When presented with cross-motions for summary judgment, the court must evaluate each party's motion on its own merits. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (*citing Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987). Cross-motions are simply a claim by each party that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not establish that if one is rejected the other must necessarily be allowed. *Bataco Indus., Inc. v. United States,* 29 Fed. Cl. 318, 322 (1993), *aff'd* 31 F.3d 1176 (Fed. Cir.1994).

A movant will be entitled to summary judgment when, under the governing law, there are no disputed issues of material fact. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS,* 998 F.2d 979, 982 (Fed.Cir.1993). Material facts are those which will significantly affect the outcome of a suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

The moving party bears the initial burden of demonstrating the absence of all genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988). Once the moving party has made a sufficient showing, then the burden shifts to the non-moving party to present facts evidencing a reasonable dispute as to any material factual issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), *cert. denied,* 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 527 (1987); *see also J.P. Emco v. United States,* No. 90–617T, 1996 WL 751363 at *11 (Fed.Cl. Sept. 18, 1996) (citing *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990)) (legal conclusions alleged by non-movant insufficient to preclude summary judgment). All factual inferences will be held in favor of the non-moving party. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356 (1986).

Moreover, summary judgment will be appropriate when the material facts are adequately developed in the motion papers, such that a full trial will be useless because additional evidence could not reasonably be expected to change the outcome of a case. *Brown v. United States,* 30 Fed.Cl. 23, 26 (1993) (*citing Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 626 (Fed.Cir. 1984)).

## III. DISCUSSION

### A. Ripeness/Statute of Limitations

Before addressing the various elements of the parties' substantive takings arguments, the issue of whether this matter was brought within the applicable six-year statute of limitations as provided in the Tucker Act, 28 U.S.C. § 1491, will be addressed *sua sponte* as it presents an issue requiring clarification.

Determination of the date upon which a taking claim accrues requires consideration of each element of the taking claim as it relates to the facts of the particular case. *See e.g., Preseault v. United States,* 100 F.3d 1525, 1538 (Fed.Cir.1996). In certain takings cases, the mere enactment of legislation has effectively deprived an owner of his property, and commenced the running of the statute. *See Alliance of Descendants of Texas Land Grants v. United States,* 37 F.3d 1478, 1482 (Fed.Cir.1994), *cited in Fallini v. United States,* 56 F.3d 1378, 1380 (Fed.Cir.1995), *cert. denied* —— U.S. ——, 116 S.Ct. 2496, 135 L.Ed.2d 189 (1996). In those cases, the

relevant statute did not set forth contingencies upon which the parties' property might be taken in the future, but rather, the very enactment of the statute caused the deprivation. *See e.g. Alliance of Descendants*, 37 F.3d at 1482 (property interest in cause of action accrued on passage of Treaty precluding such actions); *Maniere v. United States*, 31 Fed.Cl. 410, 421 (1994) (bank with vested right in property affected by passage of FIR-REA, OTS banking statute and related regulations); *Whitney Benefits, Inc. v. United States*, 18 Cl.Ct. 394, 406–07 (1989), *op. corrected*, 20 Cl.Ct. 324 (1990), *aff'd* 926 F.2d 1169 (Fed.Cir.), *cert. denied*, 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991) (denial of mining permit would not fix cause of action because statute forbid coal mining "from its very inception").

■ In contrast, in the instant matter, as in *Preseault*, another case arising out of the operation of the Rails-to-Trails Act, passage of this 1983 statute merely created a regime within which a taking could occur under certain specific factual circumstances and could therefore not fix the statute of limitations for a takings action.[16] *Preseault*, 100 F.3d at 1538–39. The *Preseault* court stated that the enactment of broad legislation authorizing a federal agency to engage in future regulatory activity is not the type of government action that alone supports a taking claim. *Id.* (citing *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981)). A taking cannot occur under 16 U.S.C. § 1247(d) until either (1) a railroad effects an abandonment of a railroad easement under state law but the reversion to the fee owner is obstructed by way of federal statute, and/or (2) an approval of a plan for a hiker/biker trail which would burden a right-of-way with an additional servitude. *See e.g. Preseault*, 100 F.3d at 1538–39. Only at either of these two points would the implementation of the Rails-to-Trails Act actually cause a taking of property of an underlying fee owner. *Id.* Likewise, if CCLC's contention is correct—that it has retained ownership of the underlying fee to MSRR's former right-of-way—then a taking could occur either at the point of abandonment under state law, or, even if there has been no abandonment, the point at which the land was asserted to have been burdened by an additional servitude of a hiker/biker trail.

■ However, the statute of limitations does not start to run until there has been an administrative determination and assignment to a hiker/biker trail. *See id.* Only then will the taking claim be ripe for determination. The *Preseault* court expressed the underlying rationale by explaining that "[u]ntil the ICC makes the administrative decision to convert an unused right-of-way to a trail, rather than simply permit abandonment, and finds an appropriate public agency to operate the trail, a landowner's suit for a taking would run afoul of established requirements for exhaustion of administrative remedies." *Id.* (citing *Hodel*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981)); *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). Before such determination, the parties cannot be certain that the ICC will postpone an abandonment or increase the usage upon the railroad right-of-way. Of course, once suit has been brought, a taking may be held to have occurred during the ensuing period of time during which the owner is unable to use his or her property prior to determination. *See e.g., First English Evan. Luth. Church v. Los Angeles Cty.*, 482 U.S. 304, 322 n. 10, 107 S.Ct. 2378, 2389 n. 10, 96 L.Ed.2d 250 (1987). (citing *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1, 5, 104 S.Ct. 2187, 2191–92, 81 L.Ed.2d 1 (1984)).

■ The ICC issued its decision authorizing abandonment of MSRR's use of the right-of-way on February 25, 1988, and providing for a 180-day period within which to

---

16. Nor could the previous railroad legislation—including the Transportation Act of 1920, ch. 91; 41 Stat 456 (1920); or the Rail Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31 (1976); 49 U.S.C. §§ 10101 *et. seq.* While the 1920 Act constituted broad general legislation authorizing the regulation of railroads by the federal government, the 1976 Act contained authorization for the ICC to order a railroad, proposing to dispose of an unneeded right-of-way, to first offer it for sale for "public purposes." 49 U.S.C. § 10906 (1994).

permit for the transfer and sale of the right-of-way to an appropriate entity. The administrative approval of Montgomery County's purchase then occurred December 14, 1988, when the ICC issued a Certificate of Interim Trails Use "CITU", permitting Montgomery County's proposed uses of the right-of-way pursuant to 16 U.S.C. § 1247(d). CCLC filed this action on April 8, 1992. Therefore it filed this action within the applicable six-year limitations period.

■ The Club's complaint, filed on January 22, 1993, is also timely. The actual taking alleged by the Club is somewhat different from that alleged by CCLC. The Club objects to an excess use of the right-of-way by Montgomery County. It asserts that implementation of the proposed plan will interfere with its ability to utilize its golf course—portions of which are located within, and the majority of which is located adjacent to—the right-of-way. As such, the Club's alleged taking claim did not accrue until Montgomery County purchased the right-of-way in 1988.[17]

## B. Taking Claim of Chevy Chase Land Company

### 1. Property Interest

■ In order to decide whether a taking has occurred, initially it must be determined whether CCLC has a compensable interest in the property at issue. This Court has jurisdiction to determine title to real property as a preliminary matter when addressing a taking claim. See e.g. Yaist v. United States, 228 Ct.Cl. 281, 656 F.2d 616 (1981) (citing Bourgeois v. United States, 212 Ct.Cl. 32, 545 F.2d 727, 729 n. 1 (1976)). CCLC therefore, must, at the outset, provide sufficient proof that it retains the underlying fee simple absolute title to the right-of-way, and did not convey it to MSRR by the 1911 deed. See Preseault, 100 F.3d at 1532–37. The issue

presented is whether CCLC conveyed a fee simple or an easement by the 1911 deed.

### a. Description of Asserted Interests

Prior to turning to the 1911 deed, it is necessary to define the terminology involving estates in land which the parties utilize to discuss the conveyance here at issue. The concept of estates involves the legally permissible interests in land as measured by a time element. State Roads Commission v. Johnson, 222 Md. 493, 497–98, 161 A.2d 444, 447 (1960) (citing Gavit's Notes on Blackstone's Commentaries, at 281). Possessory estates may be held for a variety of different durations. A fee simple absolute (often inaccurately described as "fee simple") is of infinite duration, and comprises the greatest estate that one can possess. Roger A. Cunningham et al., The Law of Property, § 2.2, at 29 (2d ed. 1993) (hereinafter "Cunningham § ___ at ___."). See generally, Johnson, 161 A.2d at 447 (" 'absolute estate in perpetuity' is synonymous with 'fee simple absolute' "). Other possessory estates are limited in duration, such as the defeasible fee simple (abbreviated by the occurrence of a specified event), the fee simple determinable (lasting only "so long as" a designated state of affairs continues), and so on.[18]

Easements, as opposed to possessory estates in land, do not impart a right of possession and full use, but rather, a specifically defined right to use land which is owned and possessed by another. Cunningham, § 8.1, at 437. When a mere easement is conferred, another individual property owner retains the underlying fee simple interest. At the point the easement uses lapse, a full, unburdened interest in the parcel will again be possessed by the individual owning fee simple title. Often, instead of calling a property owner's retained interest a "fee simple burdened by an easement," some commentators, and indeed, at times the parties in this case,

---

17. Further, whether Montgomery County merely has an easement—or if Montgomery County bought a fee simple—does not matter with regard to the Club's claims, because the Club asserts that its property interests within the right-of-way as well as its adjacent property will be affected by this purchase and accompanying intended use in either case.

18. For a complete discussion of the various types of possessory and non-possessory estates, see Cunningham, §§ 2.1—2.10, at 26–62; see also Bd. of Cty. Supervisors of Prince William Cty., Virginia v. U.S., 48 F.3d 520, 526 (Fed.Cir.1995).

have labelled the retained interest following the creation of an easement as a "reversion" in fee. This is because upon termination of the easement, the full estate "reverts" to the owner.[19]

Easements are generally created and transferred by the same kinds of instruments as possessory estates in land and usually pass under the same statutes of inheritance. Cunningham, § 8.1, at 437. While owners of possessory estates enjoy exclusive occupation, meaning the possessor may wholly exclude all others from all parts of the land without having to show that the other individual will actually interfere with any aspect of use and enjoyment, with an easement the right to exclude others extends only so far as to prevent their interference with the servitude's particular purpose. *Id.* As an easement confers only limited uses of a parcel of land, the owner of the underlying fee may make all uses of the land that do not unreasonably interfere with the easement. *Id.*, § 8.9, at 460.

Another distinction between the two interests lies in their alienability. Fee simple absolute estates in land are freely alienable. Generally, easements are not, with the exception of commercial easements—ones held for business uses or that have independent economic value. *Id.*, § 8.10, at 461 n. 3, 4. Therefore, while fee simple absolute owners may grant at their discretion easements or licenses to others to use their land, to the extent that commercial easement holders can grant or divide their easements among additional parties, they may only convey easements to others for uses covered by their easement.

**b. Construction of 1911 Deed between CCLC and MSRR**

All parties have stipulated that prior to the conveyance embodied in the 1911 deed, CCLC owned legal title to the land at issue in this case. Although all parties submit to the authenticity of the 1911 deed, the parties dispute its legal meaning. Plaintiffs say that it conveyed an easement to the right-of-way

at issue for railroad purposes. They assert that the parties' shared intent is illustrated by language in the 1891 Agreement as well as the railroad's charter. Plaintiffs maintain that the right-of-way was owned by CCLC throughout this century as a present estate in fee simple absolute, subject to the burden of an easement held by MSRR. Defendants assert that the deed simply conveyed the right-of-way in fee simple absolute.

■ The nature of the interest conveyed is determined according to the law of the state where the conveyance occurred. "[S]tate law creates and defines the scope of the reversionary or other real property interests affected by the ICC's action pursuant to Section 208 of the National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d)." *Preseault v. I.C.C.*, 494 U.S. at 20, 110 S.Ct. at 926 (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001, 104 S.Ct. 2862, 2871–72, 81 L.Ed.2d 815 (1984).

■ Maryland law requires that a court look to the 1911 deed language to determine the nature of the interest conveyed. *See Levin v. Cook*, 186 Md. 535, 538–39, 47 A.2d 505, 507 (1946) (citations omitted). Under Maryland law the acceptance of a deed gives rise to a presumption that it is an execution of the whole contract of conveyance of real property. *Id.* All other prior agreements become null and void, except where the agreement contains covenants collateral to the deed or where the deed appears to be only a partial execution of the contract. *Id.; Preseault*, 100 F.3d 1525 (other documents such as railroad charters considered collaterally).

■ In construing the import of a deed, a court must endeavor to deduce the intentions of the parties by considering the deed instrument as a whole, viewing the language used in light of the facts and circumstances of the transaction at issue as well as the governing law at the time of conveyance. *Watson v. Raley*, 250 Md. 266, 268–69, 242 A.2d 488, 489–90 (1968); *Green v. Eldridge*, 230 Md. 441, 447–48, 187 A.2d 674, 677

---

19. Labelling the underlying fee owner's retained interest as a reversion is not consistent with the traditional estate classification scheme, which views the retained interest as a present estate in fee simple, subject to the burden of the easement. *Preseault*, 100 F.3d at 1533.

(1963); *Brown v. Whitefield*, 225 Md. 220, 169 A.2d 920 (1961); *Whittington v. Mann*, 211 Md. 199, 126 A.2d 617 (1956). The entire deed is to be given effect and the parties' intent must prevail. *Bright v. Lake Linganore*, 104 Md.App. 394, 416, 656 A.2d 377, 389 (1995), *citing Guilford Ass'n, Inc. v. Beasley*, 29 Md.App. 694, 700, 350 A.2d 169, 172–73 (1976) (courts must consider the circumstances surrounding the parties at the time a covenant is made). Parol evidence may be considered of collateral and independent facts which tend to support a deed, provided it is not offered for the purpose of varying the agreement. *Fedder v. Component Structures Corporation*, 23 Md.App. 375, 380, 329 A.2d 56, 60 (1974); *Levin*, 47 A.2d at 507.

■ If, after considering the surrounding circumstances and applicable principles of construction, the legal import of the deed is apparent, the Court may conclude its analysis at that point, and render a decision as to the nature of the interest granted upon a motion for summary judgment or similar summary proceeding. *See Eldridge*, 187 A.2d at 677 (case decided on dismissal of bill of complaint, deed language required construction as easement, and circumstances surrounding conveyance were considered to be in accord with such reading).[20]

■ However, if the deed is ambiguous, or susceptible of two reasonable meanings, then the shared intent of the parties to the conveyance becomes a genuine issue of material fact limiting the grant of summary judgment. In determining whether a deed is ambiguous, the court need not necessarily look for a particular word or phrase which may be susceptible of two meanings, but must look to the document as a whole. *See Midkiff v. Castle and Cooke, Inc.*, 45 Haw. 409, 415–16, 368 P.2d 887, 891 (1962); *Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir.1985) (ambiguity only exists

if instrument is susceptible of at least two fairly reasonable meanings).[21]

The general thrust in construction of a deed involving a right-of-way has been that the clearer and fuller use indicated as granted, the more likely that the intended grant was a fee simple absolute; the more limited the use, the more likely that an easement was conveyed. John O. Dyrud, *Railroad Rights of Way—Types of Interests Acquired*, 22 Maryland L.Rev., 57, 61 n. 16 (citing 2 American Law of Property § 8.21 (1952)) (hereinafter "Dyrud, 22 Md.L.Rev., at ___"). In construing whether a fee simple absolute or an easement has been conveyed by deed, Maryland courts have considered some or all of the following factors: (1) the specificity of the language of the deed describing the parcel being conveyed and any limitations on use of the subject parcel, (2) the extent of the privilege of usage granted, (3) the extent of the consideration offered, (4) whether the party claiming title needed to retain a possessory estate, (5) the type of deed by which the parcel was conveyed, (6) the duration of the interest conveyed, (7) as well as all relevant surrounding circumstances at the time of conveyance, such as which party was to be assessed and pay taxes on the parcel. *See generally, DC Transit v. State Rds. Comm'n*, 259 Md. 675, 270 A.2d 793 (1970), appeal after remand, 265 Md. 622, 290 A.2d 807 (1972) ("DC Transit II"); *E. Washington Ry. Co. v. Brooke*, 244 Md. 287, 223 A.2d 599 (1966); *Eldridge*, 187 A.2d at 677–78.

These factors are applied in conjunction with the applicable rules of construction set forth in the governing law. In 1911, at the time of conveyance here at issue, Maryland law included the following provisions:

No words of inheritance shall be necessary to create an estate in fee simple, but every conveyance of real estate shall be construed to pass a fee simple estate, unless a

**20.** *See Johnson v. Valdosta*, 169 Ga. 559, 150 S.E. 845 (1929) (in an action to recover title, demurrer sustained by appellate court when lower court had considered attendant circumstances and principles of law and had come to conclusion that fee simple absolute had been conveyed to railroad).

**21.** Circumstances surrounding the making of the deed and any relevant usage of trade, course of dealing and course of performance comprise the sort of parol evidence a court may consider to determine the intent of the makers of the instrument. *Amoco Prod. Co. v. Western Slope Gas Co.*, 754 F.2d 303, 308 (10th Cir.1985).

contrary intention shall appear by express terms or be necessarily implied therein.

Md.Code, Conveyancing, Art. 21 §§ 11 (1911). Although "fee simple" language designates intended duration, Maryland courts have generally interpreted this statutory language to be referring to the fee simple absolute estate as compared to more limited interests. *See e.g. Richfield Oil Co. v. Chesapeake & C.B.R. Co.*, 179 Md. 560, 571–72, 20 A.2d 581, 587 (1941).

The word "grant," the phrase "bargain and sell," in a deed, or any other words purporting to transfer the whole estate of the grantor shall be construed to pass to the grantee the whole interest and estate of the grantor in the lands therein mentioned, unless there be limitations or reservations showing, by implication or otherwise, a different intention.

Md.Code, Conveyancing, Art. 21 §§ 12 (1911).

Additional principles of construction extant in Maryland law at the time of the conveyance provided that restrictions were not be implied, and all doubts or ambiguities were to be resolved in favor of allowing the free use of the property. *Maryland Trust Co. v. Tulip Realty Co.*, 220 Md. 399, 409–10, 153 A.2d 275, 282 (1959); *accord Bd. of Cty. Supervisors of Prince William Cty., Virginia v. United States*, 48 F.3d 520, 526 (Fed.Cir. 1995) (citing Richard R. Powell and Patrick J. Rohan, 5B Powell On Real Property, §§ 839–40 (1994) (restraints on alienation of property are generally disfavored)). Further, Maryland courts have time and again applied the rule that contracts will be construed against the grantor. *See Hodges v. Owings*, 178 Md. 300, 303–04, 13 A.2d 338, 339–40 (1940); *see also Yorkway Apartments, Inc. v. Dundalk Co.*, 180 Md. 647, 650, 26 A.2d 398–99 (1942). Additionally, Maryland law provided that railroads had the right to acquire fee simple absolute interests as well as easements. *See* 1870 Md.Laws ch. 476 § 10 (authorization to condemn land); 1852 Md.Laws ch. 326 § 14 (authorization for B & O to condemn land); *also see* 1904 Md.Laws art. 23, § 259 (may acquire lands by purchase or gift).

With this in mind, the relevant language in the deed must be examined:

... the said party of the first part (CCLC), for and in consideration of the sum of FOUR THOUSAND (4,000) DOLLARS, to it paid by the said party of the second part (MSRR), does hereby grant and convey unto the said party of the second part, its successors and assigns, a free and perpetual right of way, one hundred (100) feet wide, over the land and premises hereinafter designated as "Parcel A" and does hereby grant and convey unto the said party of the second part, its successors and assigns, in fee-simple, the land and premises, hereinafter designated as "Parcel B"....

1911 Deed (emphasis added).

It describes the right-of-way, or Parcel A, by metes and bounds, and summarizes it as a

... ALL that piece or parcel of land described by metes and bounds ... parcel being a strip of land fifty (50) feet wide on each side of the center line of the Metropolitan Southern Railroad through the land of the Chevy Chase Land Company....

The deed's warranty clause states,

AND the said party hereto of the first part hereby covenants to warrant specially the property hereby conveyed, and to execute such further assurances of said land as may be requisite.

It further points out that the conveyance is

SUBJECT to existing right of way for highway and other purposes over what is known as Connecticut Avenue Extended.

Legally significant aspects of the deed language can be categorized into the following groups: (1) the degree of limitations upon the conveyance; (2) usage of the term "fee simple;" (3) additional language of the deed; (4) the consideration contemplated; and (5) the additional surrounding circumstances.

### 1. Limitations Upon the Conveyance

Under Maryland law at the time of the conveyance, the word "grant" was held to pass the whole estate of the grantor unless the deed contained "limitations or reservations" indicating otherwise. Md.Code, Conveyancing, Art. 21 §§ 11–12 (1911). In cases

involving the construction of a deed referencing a right-of-way, Maryland courts have found that if a corridor has been designated for railway purposes, that such limitation evidences intent to convey merely an easement, and not a fee simple absolute interest. *See e.g. Richfield Oil,* 20 A.2d at 584; *but see* 4 H Tiffany, The Law of Property § 980.1 (3d ed. 1939) (a purpose clause, of and by itself, does not operate to limit the estate granted by the deed; it does not convert an otherwise absolute granting and habendum clause into an easement or other limited estate, unless there is other language clearly manifesting such an intention).

However, as stated earlier, the legal significance of the conveyance of a "right-of-way" has differed based upon the presence or absence of limitations in deeds conveying these parcels. The fuller the use of the property transferred the stronger is a case that a fee simple has been transferred, and courts have considered unqualified use of the term right-of-way to denote a possessory estate. Cunningham, § 8.3, at 443. The absence of limitations has influenced courts to find that a fee simple absolute had been conveyed. *See e.g. Sowers v. Illinois Cent. Gulf R. Co.,* 152 Ill.App.3d 163, 172–73, 105 Ill.Dec. 76, 82–83, 503 N.E.2d 1082, 1088–89 (1987). Baldwin's treatise on railroad law, which was published in 1904, seven years prior to the conveyance at issue, explained that to construct a deed granting an easement, a party must state in the granting clause of a deed "a right of way for railroad purposes over and upon." Simeon E. Baldwin, *American Railroad Law,* IV at 609–10 (1904).

The deed language here at issue contains no limitations upon MSRR's use of the right-of-way. In 1911 prior to the conveyance, CCLC owned the right-of-way parcel as an estate in fee simple, and the granting clause of the deed provided that CCLC was to "grant and convey" the land as a "right-of-way." The only limitation on CCLC's grant to MSRR involved what amounted to a reservation by CCLC of a "right of way for highway purposes" on Connecticut Avenue which would cross over MSRR's right-of-way. This phrase recognized a usage limitation upon Connecticut Avenue for an existing ease-

ment. That CCLC designated that this other right-of-way was "for highway purposes" would suggest that CCLC understood that limiting language was necessary for the creation of an easement. Yet, with respect to MSRR's right-of-way, no limitation was stated. These facts point to an intent to convey the right-of-way in fee simple absolute.

CCLC stresses that all Maryland courts have found conveyances of rights-of-way to have involved easements and not fee simple absolute estates. *See e.g. U.S. v. 1.44 Acres of Land,* 304 F.Supp. 1063, 1070 (D.Md.1969); *D.C. Transit I,* 270 A.2d at 795; *East Washington,* 223 A.2d at 603. Plaintiffs interpret this fact as meaning that any grant of a right-of-way in the state of Maryland would involve an easement. Although the circumstances in the cases previously addressed by Maryland courts were determined to have militated in favor of easements, in fact, Maryland courts have acknowledged that the conveyance of a right-of-way may involve a fee simple absolute estate or an easement. *Maryland & Pa. R.R. v. Mercantile–Safe Deposit and Trust Co.,* 224 Md. 34, 37 n. 1, 166 A.2d 247, 248 (1960), *cited in Read v. Montgomery County, Md.,* 101 Md.App. 62, 69, 643 A.2d 476, 479 (1994). The Maryland Court of Appeals stated, "[i]n one sense it is 'the strip of land upon which the track is laid'; in the other sense it is 'the legal right to use such strip.'" *Id.* In legal terms a "right-of-way" denotes an easement, but in railroad parlance and lay speech it indicates a possessory estate of the strip of land upon which the track is laid. John O. Dyrud, Railroad Rights of Way—Types of Interests Acquired, *supra,* at 62 n. 21; *see also D.C. Transit I,* 270 A.2d at 799; *Maryland & Penn. R.R. Co. v. Mercantile–Safe,* 166 A.2d at 248 n. 1; *United States v. 1.44 Acres of Land,* 304 F.Supp. 1063, 1071 (Md.1969); *Joy v. City of St. Louis,* 138 U.S. 1, 44, 11 S.Ct. 243, 255–56, 34 L.Ed. 843 (1891).

The majority of Maryland right-of-way cases have involved deeds containing language denoting that the grant was for a specified use, such as for "railroad purposes" or a railroad company's "chartered purposes," or other similar purpose restrictions in the granting or habendum clauses. *See*

*1.44 Acres of Land,* 304 F.Supp. at 1070 ("right of way for its chartered purposes" in deed indicated easement); *D.C. Transit I,* 270 A.2d 793, 795 (1970) (habendum clause specifies tract indicated was for a right-of-way and such other purposes as said Railway Company is authorized under its act of incorporation); *East Washington,* 223 A.2d at 603 ("right of way ... being a strip of land ... for railroad purposes"); *Richfield,* 20 A.2d at 584 ("rights of way for railroad purposes"). In these cases, Maryland courts have found the phrase "for railroad [or other specific] purposes"—whether in the granting or habendum clauses of the deed—to be language conditioning the grantee's use of the land. As such, they determined that only a right or privilege to use the land, an easement, had been intended to be conveyed.

Other Maryland cases have involved deeds which did not specifically include limiting language such as "for [specified] purposes" within the granting clause, as was used in *1.44 Acres, D.C. Transit, E. Washington* and *Richfield,* yet it was determined that the language of the deeds as a whole indicated that the grant was confined to a privilege or right conditioned upon certain circumstances. *See Eldridge,* 187 A.2d at 675; *Hodges,* 13 A.2d at 339–40. For example, in *Hodges,* the deed conveyed "... a strip of land ... width as may be required in the construction and use of said Railroad ... together with the right to divert streams of water for Railroad purposes, and to take and use any stone or timber or other material within the limits of said strip of land...." *Hodges,* 13 A.2d at 338–39. In construing this language to convey only an easement, the court held that if there had been an intention to convey the underlying fee, the right to use the stone, timber and other materials on the land would have come automatically, without leave or permission from the grantor or anyone else. *Id.* at 340.

In *Eldridge,* the deed's granting clause conveyed "the uninterrupted use, liberty and privilege of, and passageway in and along a certain right of way...." *Eldridge,* 187 A.2d at 675. In construing the import of the deed, the court held that this language as a whole evidenced the conveyance of a privi-

lege to use land—an easement—and not an estate in land. *Id.* at 677–78.

█ The instant case is easily distinguished from the scenarios presented previously in Maryland courts, because there is no conditional language limiting the uses of the right-of-way parcel; rather, the deed provides for a "free and perpetual right of way"—thus indicating full, unrestricted use. Again, the only limitation on the use of the right-of-way parcel was that it was subject to "an existing right of way for highway and other purposes over what is known as Connecticut Avenue"—a pre-existing easement. This was merely a provision marking a public highway right-of-way. It did not limit the scope of uses of the railroad's right-of-way. Further, it did not prevent the other parcel, the one previously allotted for the depot, from being conveyed as an estate in fee simple absolute.

Thus, due to the outright grant of the right-of-way and the absence of purpose limitations, consideration of the deed in conjunction with conveyancing law of the time lends strength to a construction of the transaction as contemplating a fee simple estate. Several additional elements serve to reinforce the construction of the term "right-of-way" as describing an estate in fee simple absolute. These factors include (1) the prior existence of the right-of-way; (2) the warranty clause in the deed; and (3) the fact that other deeds of the time period from CCLC to various railroads and entities contained limiting language.

First, the fact that the right-of-way had already been built may indicate that the parties had intended the conveyance of a parcel in fee simple absolute, and not an easement. *See Sowers,* 105 Ill.Dec. 76, 503 N.E.2d 1082. Once the tracks have already been laid, the term right-of-way in a deed may be construed to likely have referenced a physical entity and the land supporting it—as opposed to a mere right or privilege of passage, as the term "right-of-way" when used in the abstract, may be held to connote. *See e.g. Eldridge,* 187 A.2d at 674; *East Washington,* 223 A.2d at 603. As in *Sowers,* use of the term right-of-way was, necessarily, a reference to the identity of the location of the land

conveyed as that land which had already been occupied by the grantee railroad company as its roadbed. 105 Ill.Dec. at 82–83, 503 N.E.2d at 1088–89. This reference served to locate the strip of land conveyed—and designate its specific metes and bounds.

Maryland right-of-way cases have generally involved deeds referring to rights-of-way which were projected to be built in the future—not rights-of-way which were already built at the time of conveyance. *See 1.44 Acres*, 304 F.Supp. 1063; *Eldridge*, 187 A.2d 674; *Hodges*, 13 A.2d 338 (deed granted land "as may be required" indicating construction of railroad to occur in future); *cf. Richfield*, 20 A.2d at 585. *Richfield* is the only Maryland case involving the conveyance of a right-of-way with tracks already laid upon it. However, the facts of *Richfield* are distinguishable from the instant case and *Sowers*. In *Richfield* usage limitations were set forth in the deed. Further, the grantor was the parent corporation of the grantee. As such, the court reasoned that the grantor would not have intended to grant a fee because doing so might result in its loss of the ability to cross from one part of its land to another should the grantee come under new ownership at some point in the future. *Richfield*, 20 A.2d at 587. Therefore, in the instant case, Maryland courts would likely determine that existence of the tracks prior to the conveyance would explain the usage of the term right-of-way and that, consequently, the term was descriptive of the actual land and tracks, and not of a prescribed use of the parcel, as would be indicative of an easement.

Secondly, and further illustrative of an intent to convey a fee simple in this case, is the deed's warranty clause. The clause provides that CCLC "... covenants to warrant specially the property hereby conveyed, and to execute such further assurances of said land as may be requisite." (emphasis added). By referring to land, and not distinguishing between parcel A (the right-of-way) and parcel B, this clause demonstrates that the intent was to convey land or real property—and not a mere right to use the described parcels.

Further, the fact that there were no limitations on the use of the right-of-way is even more telling in light of the surrounding cir-

cumstances. *See Fedder*, 329 A.2d at 60; *Levin*, 47 A.2d at 507 (parol evidence may be considered of collateral and independent facts which tend to support a deed, provided it is not offered for the purpose of varying the agreement). During this very time period, CCLC executed several deeds which contained precise usage limitations in order to convey interests lesser than fee simple estates, illustrating that CCLC was aware at the time it executed the 1911 deed that words of purpose limitation were necessary to create an easement.

Around the same time, on November 8, 1894, CCLC deeded to the Chevy Chase and Kensington Electric Railway Company

"... a right of way over ... A strip of land 25 feet wide ... subject to the following provisos, limitations and conditions. The said [railroad company] shall construct and complete and commence regularly operating within nine months hereafter an electric railway.... [I]f the said [railroad company] ... shall thereafter fail to continuously operate said railway as an electric railway the interest of the said [railroad company] in the right of way hereby conveyed shall at once cease and determine and the same shall therefrom revert to [the Land Company]...."

FDA 5–7 (emphasis added). Here, the Club clearly spelled out limitations upon the grantee's usage of its right-of-way.

Again, on April 14, 1896, CCLC executed a deed with the Glen Echo Railroad Company of Montgomery County, Maryland, similarly containing specific limiting conditions, contemplating "... a right of way for the purpose of constructing and operating the railroad...." It further provided, "the said right of way shall only be used and occupied by the said railroad company as a right of way for an Electric railroad, and for no other purpose or service whatsoever...." This limiting language indicated an intent to convey an easement.

During the late nineteenth and early twentieth centuries, CCLC executed numerous other deeds for highways, parks and parkways as well as for land to a schoolhouse. In each it described contingencies upon which

the easement would lapse and the land would revert to CCLC in fee simple absolute.

The 1911 deed does not even refer to the word "railroad," let alone restrict the use of the land to railroad purposes. Nor does it contemplate a reversion or lapsing of the right-of-way. Based upon CCLC's failure to include any restrictive or reversionary language, the warranty clause contained within the deed which warrants both parcels in the same manner, as well as CCLC's contemporaneous deeds containing clear limiting language, the 1911 deed must be construed to reflect an intent to grant a fee simple absolute, and not an easement.

### 2. Use of Term "Fee Simple"

■ Plaintiffs maintain that the granting clause of the deed evidences a distinction in the nature of the interests granted in the two parcels, because while both are referred to as parcels "of land," parcel A, the right-of-way, is merely described as "free and perpetual," whereas parcel B is described as being conveyed in "fee simple." In so arguing, Plaintiffs assume that the term "fee simple" as contained in the 1911 deed, designates ·an estate in fee simple absolute, whereas usage of the terms "free and perpetual" merely defines the contemplated extent and duration of the use of the right-of-way granted by CCLC.

In actuality, usage of the terms "perpetual" and "fee simple" in the granting clause of the deed further illustrates that the same interest was to be conveyed in the two parcels involved in this case. Although the words "fee simple" often have been misinterpreted as designating the nature of a property interest as being an estate, the term actually defines duration. The term "fee simple" specifically relates to the time element or the duration of the interest, and indicates that the holder of an interest in land retains such

right in perpetuity—for infinity. Cunningham, § 11.1, at 766 n. 53. Both easements and possessory estates in land may be conveyed in fee simple and thus be of perpetual duration. *Id.; see Eldridge,* 187 A.2d at 677. Easements—unless otherwise indicated—are generally held in fee simple, See Md. Real Property Code § 4–105—"every grant or reservation of an easement passes or reserves an easement in perpetuity." [22] In the instant case, there is no reason to believe that the term was misused by the parties to distinguish the interest conveyed in the depot—as a possessory estate—from the interest conveyed in the right-of-way.

Further, the parties' prior history illustrates that before the execution of the 1911 deed, there had been no distinction in the way that the parties had intended to convey the parcels. Indeed, the parcels were referenced identically in the 1891 Agreement and the 1910 letter from a CCLC official.

The unrecorded 1891 Agreement appears to intend the conveyance of an easement, as it indicates that the land discussed was to be used in conjunction with MSRR's contemplated railroad. It provided,

The Metropolitan Southern Railroad Company contemplating the construction of a line of road in connection with its Metropolitan Branch, to be known as the Metropolitan Southern Railroad, to traverse certain lands, the property of the Chevy Chase Land Company, ... [CCLC would] donate and convey to the said railroad company a right of way ... [metes and bounds description] ... and ... donate and convey to the said Railroad Company for the purposes of a passenger and freight depot, and uses incident thereto, including side tracking, the following described parcel of land (Parcel B)....

1891 Agreement (emphasis added). This language contains no distinction in its refer-

---

**22.** Often courts have drawn a misplaced distinction between fee simple and easement property interests. *See e.g. DC Transit I,* 270 A.2d 793; *Johnson,* 161 A.2d at 447. The term "fee simple" has been used as an abbreviation for the term fee simple absolute throughout the years—adding immeasurably to the confusion veiling this entire body of law. *See e.g. Johnson,* 161 A.2d at 447 (1960). *Mistakenly equating the*

words "fee simple" with an estate as opposed to duration, courts have even found "conflicts" in deeds conveying interests which they determined to be easements when the deeds contained language to the effect that the parcel was deeded in fee simple. *See Eldridge,* 187 A.2d at 678 (despite fee simple language, the court found easement had been transferred).

ences to the depot parcel and the right-of-way. Based upon its implicit (railroad usage [23]) and explicit usage limitations (freight depot) on the parcels, it is fairly clear that it contemplated the conveyance of an easement.

Then, after nearly two decades had passed, and subsequent to the completion of the railroad, in 1910 the letter from a CCLC official to one J.D. McCubbin made reference to a new instrument of conveyance which the parties had negotiated. It provided, "I have had a long talk with Senator Newlands, President of the Chevy Chase Land Company, and have succeeded in getting his consent to the arrangement suggested by you sometime during the past summer." The official continued, "the arrangement was that the Baltimore and Ohio Railroad pay to the Chevy Chase Land Company Four Thousand Dollars in cash, and in consideration of this payment, have conveyed to it, all the property covered by its right of way contract with the Land Company, entered into some years ago...." (emphasis added). The letter indicates that the 1891 agreement had been superseded and a new agreement involving conveyance of estates in the land covered by the 1891 agreement was made.

Therefore, as the term "fee simple" apparently indicated the duration and not the nature or extent of the estate being conveyed, the usage of the words fee simple in describing parcel B—the depot parcel—does not give rise to any negative implication as to the nature of the interest conveyed in parcel A.

### 3. Additional Deep Language

█ Plaintiff further asserts that usage of prepositions such as "over" and "through," denoting the location of the right-of-way within the deed illustrates that CCLC owned the underlying fee estate and that MSRR only received a right to use the land. The 1911 deed discusses a "... right of way, one hundred (100) feet wide, over the land and premises hereinafter designated as "Parcel A".... through the land of the Chevy Chase Land Company...." (emphasis added). Plaintiffs assert that Maryland courts have construed deeds with such language as con-

veying easements. Examples of such cases include, *1.44 Acres,* 304 F.Supp. at 1070, *E. Washington,* 223 A.2d 599, and *Richfield,* 20 A.2d 581.

These cases involved significant indications of an intent to grant an easement in the form of limitations on usage of the land within the deeds—and plainly did not turn on the usage of such prepositional phrases. *See id.* Cases which involved deeds lacking use limitations and where similar common law and conveyancing statutes to Maryland's were in place, such as *Midland Valley Railroad Co. v. Arrow Industrial Manufacturing Co.,* 297 P.2d 410 (Okl.1956) and *Valdosta,* 150 S.E. 845, rather, more effectively demonstrate the proper construction of the instant deed. In these cases, the "over" and "across" language referencing the exact parcel of land over which the right-of-way existed did not deter courts from construing deeds as conveying fee simple absolute estates. *See id.*

For example, in *Midland,* a strip of land had been conveyed to a railroad as a "strip of land for a right of way over and across the following described tract of land." *Midland,* 297 P.2d at 411. The land described was the actual strip which was at issue in the conveyance, and yet the court was not persuaded that the interest conveyed was an easement. *Midland,* 297 P.2d at 411. In *Valdosta,* "A strip of land sixty feet wide for a railroad right of way over, upon, and across about twenty-five acres," the precise acreage of the easement, was conveyed, and yet the court was not deterred from finding that a fee simple had been intended. *Valdosta,* 150 S.E. at 847–48.

Further, even in *Sowers,* where the right-of-way referenced in the deed was described as running across a larger plot—which at first blush might seem to indicate that the right-of-way was merely a right to use that portion of another's land, a possessory estate was held to have been conveyed. *Sowers,* 105 Ill.Dec. at 83, 503 N.E.2d at 1089. However, the fact that the tracks were built along with the syntax of the deed language, convinced the *Sower's* court that the words "over

---

**23.** Further below in the 1891 Agreement, the parties also contemplated the construction of the

railroad tracks upon the rights-of-way as part of the bargain. *See* MC–3.

and above" merely "served to locate the strip of land conveyed out of a larger tract." *Id.* Such language was "consistent with the description of the right of way," as the tracks and roadbed had already been laid upon the parcel of land at issue in the deed. *Id.*

Thus, usage of the terms "through" and "across" someone else's adjacent land by the involved parties does not necessarily indicate that the grantee was not being conveyed an estate in the tract in question.

Of notable significance is that the 1909 license agreement between MSRR and the Columbia Country Club provided, "[w]hereas, the said Metropolitan Southern Railroad Company owns and maintains a right-of-way, road-bed and track running **through and across the said land of the said Columbia Country Club.**" (emphasis added). If this court were to apply Plaintiff's own reasoning, the words through and across would indicate that the Club owned the underlying fee and that the MSRR owned tracks running across this fee. It is quite clear, however, that in this instance the Club did not acquire by conveyance the fee underlying the MSRR tracks—none of the parties have asserted this.

It is therefore apparent that at the time the 1911 deed was negotiated and drafted, it was common usage to utilize these prepositional phrases to locate a parcel. Therefore, it is more probable that these prepositional phrases were used for descriptive purposes and were not necessarily intended to dictate or circumscribe the interest conveyed in the land. Accordingly, this language is not determinative of the interest conveyed by the 1911 deed.

### 4. Consideration

Courts have considered the extent of consideration exchanged as a factor in this analysis, as well—the greater the consideration exchanged, the more likely the court will construe a right-of-way deed as intending the conveyance of a fee simple absolute. *See e.g. Valdosta,* 150 S.E. at 847–48. The 1911 deed speaks of $4000 consideration in return for a 12–acre right-of-way and a .9 acre depot lot. CCLC points out that the deed states that the $4000 payment was actu-

ally for the cancellation of the depot construction obligation arising in the 1891 agreement, and further assert that this amount was not substantial enough consideration for a conveyance of the right-of-way in fee simple absolute in 1911, in light of the higher jury awards for easements condemned between 1891–93. Thus, CCLC contends that it was only enough to compensate for the conveyance of an easement interest. Defendants, on the other hand, point to the December 20, 1910 letter by a CCLC official which indicates that the $4000 was to be paid in consideration of the conveyance of the "property covered by its right of way contract with the Land Company," [including the railroad corridor and the depot tract], as well as the waiver of the obligation to build a depot.

First, regarding CCLC's contention that the amount of consideration was insubstantial, the cases involving higher jury awards presented by CCLC are not probative with regard to the consideration inquiry in this case because they involved condemnation proceedings where parties' land was taken away against their wishes. As stated above, this case involves a bargained-for deed.

Additionally, four thousand dollars would appear to be more than nominal consideration for a 12–acre right-of-way and .9 acre lot conveyed in the 1911 deed. In *Valdosta,* 150 S.E. 845, a court found $400 to be substantial consideration for the conveyance of 25 acres in fee and factored this into its ultimate construction of a similar deed for a railroad right-of-way to be conveyed in fee simple. ($400 was substantial consideration for right-of-way, as distinguished from case where easement held conveyed for benefit of construction of railroad + $5.). *See Phillips v. Missouri–Kansas–Texas Ry. Co.,* 20 F.Supp. 498, 503 (W.D.Okl.1937) ($650 consideration given, and no purpose limitation results in finding of fee simple); *Midkiff v. Castle & Cooke, Inc.,* 368 P.2d at 889 (1899 transfer of in excess of 23.8 acres for consideration of $3294 found to confer fee simple). In comparison, in the Maryland cases where the courts held that easements had been transferred, the consideration was nominal. *See e.g. DC Transit I,* 270 A.2d 793 ($1.00

consideration); *Hodges,* 13 A.2d at 338 ($1 consideration).

Further, as evidenced by the 1891 Agreement and CCLC's many dealings with railroads, CCLC had wished for railroads and public highways to adjoin and serve its Chevy Chase landholding. In this regard, CCLC had secured half-rate discount fares from MSRR for shipment of freight. A–63. Based upon this analysis, the amount of consideration tendered does not militate in either direction—that the deed contemplated either a fee simple absolute estate or an easement.

### 5. Additional Surrounding Circumstances

The parties' actions at the approximate time of the right-of-way conveyance provide additional insight into the intent behind the 1911 deed. The circumstances surrounding the purchase of land by Columbia Country Club from CCLC are perhaps most significant in deciphering the nature of the interest received by MSRR in the right-of-way.

First, the language of the license/crossing agreement between MSRR and the Club provided, "[w]hereas, the said Metropolitan Southern Railroad Company owns and maintains a right-of-way, road-bed and track running through and across the said land of the said Columbia Country Club." This language illustrates that MSRR had believed at the time that it owned and did not merely possess the right-of-way, or would own it once there had been recordation of a deed.

■■■■ Second, CCLC sold **two tracts of land** to the Club—not one large plot—in 1909. See CBA–29. The two tracts were separated by the MSRR right-of-way. Had MSRR acquired only an easement, CCLC could have conveyed the fee underlying the right-of-way to the Club, and reserved an easement over the property for MSRR, as it reserved an easement for highway purposes over Connecticut Avenue in the 1911 deed to MSRR. When a right-of-way is an easement, the owner of the servient tenement retains title to the underlying land and is entitled to use the land in any manner which does not interfere with the easement holder's

use. *See e.g. National Wildlife Federation v. ICC,* 850 F.2d 694, 703 (D.C.Cir.1988); Cunningham, § 8.1, at 436–37. No evidence has been presented illustrating that this was even contemplated by the parties. Alternatively, CCLC could have held the fee interest in the right-of-way strip of land and granted the Club an easement over the strip. CCLC did not do this either. Conveyance of the two separate parcels is therefore indicative that CCLC had already contemplated the granting of title underlying the right-of-way to MSRR, as it seems improbable that CCLC would have split the some 129–acre plot otherwise.

■■■■ Further weighing in favor of a fee simple absolute is that CCLC sent the Club to MSRR in 1909—before the execution of their agreement—to obtain the right to cross over the MSRR right-of-way. CCLC indicated to the Club that it would need to obtain written permission from MSRR to cross the right-of-way prior to purchasing the two parcels. However, one who owns underlying fee title need not obtain permission from the party in possession of the easement so long as the proposed use will not interfere with the existing easement. *See Richfield,* 20 A.2d at 589 (owner of fee title may utilize land burdened by easement so long as such usage does not "interfere or interrupt the reasonable and proper use" of the easement holder's intended use of land). The owner of the fee underlying the strip may allow third parties to use the right-of-way in a manner which does not interfere with the right-of-way easement. *West, Public Service Comm'n v. Maryland Gas Transmiss'n Corp.,* 162 Md. 298, 312, 316, 159 A. 758, 765 (1932) (unnecessary to obtain permission from State for underlying fee owner's commissioning of third party to project pipeline underneath right-of-way easement if such act would not "interfere in any way with . . . the public easement."). Crossings for the Club (such as the bridges that were erected) would not necessarily disturb the railroad. Assuming CCLC owned the underlying fee in this case, it could have arranged for Club use by simply requiring the railroad to cooperate. If the land company believed in 1911, as it now asserts, that it would continue to possess the underlying fee simple

estate in the strip, it would only have made sense that it would have provided the crossing agreement to the Club. It would not have required an agreement from MSRR.

Additionally, all evidence presented points to the fact that the railroad paid property taxes along the strip, yet another incident illustrative of ownership. CCLC has stated that it neither was assessed not paid any property taxes on the right-of-way property.

### 6. Conclusion

The parties' subsequent and conflicting understandings of the deed notwithstanding, a consideration of the entire text of the deed, as well as the corresponding circumstances surrounding its execution, reveals that the parties intended the conveyance of an estate in fee simple absolute. The parties have thoroughly presented all available evidence together with excellent briefs and arguments. In light of this construction of the 1911 deed, with respect to the claims of Plaintiff, the Chevy Chase Land Company, summary judgment in favor of the Defendants, the United States and Montgomery County, must be granted.

### 2. *ABANDONMENT*

The parties' briefs also address the contingency that the deed would be construed to have conveyed an easement instead of an estate in fee simple absolute. While it has been determined that the 1911 deed did not convey an easement, the contentions of the parties concerning the existence of a taking if an easement had been deeded in 1911 will be addressed.

Plaintiffs assert that MSRR abandoned the asserted easement, causing it to lapse and unencumbered title to lie with CCLC. Defendants continue to maintain that MSRR acquired the railroad property in fee simple absolute, but argue in the alternative that if this Court should find that only an easement were conveyed by the 1911 deed, that such easement has not been abandoned. Defendants also argue at length that Montgomery County, once having acquired the right-of-way pursuant to the Rails-to-Trails Act, also did not abandon it. In this regard, they have set forth Montgomery County's extensive plans to build a light rail and hiker/biker trail on the property. They further assert that Montgomery County's intended uses of the right-of-way are within the scope of that original easement.

 Easements for public purposes acquired by quasi-public corporations such as railroads, either by purchase, condemnation or prescription, derive their very existence from the continued use of the property for such purposes. *See Canton Co. v. Baltimore & O.R. Co.,* 99 Md. 202, 218, 57 A. 637, 638–39 (1904), *cited in Mercantile–Safe Deposit & Trust Co.,* 166 A.2d at 250. When such public use is abandoned, the easement lapses, and the fee owner is left with unencumbered title to the property. *Id.* The burden of proving abandonment rests with the party who asserts or relies upon it. *Read,* 643 A.2d at 481, (citing *Mercantile–Safe Deposit & Trust Co.,* 166 A.2d at 250). Here, Plaintiff, CCLC relies upon the abandonment to establish its takings case.

CCLC sets forth several acts which it asserts are demonstrative of the railroad's intent to abandon, as a matter of law: (1) B & O's statement in 1983 that it would abandon railroad service in three years; (2) B & O's July, 1985 resolution to seek ICC approval to terminate rail service; (3) MSRR's refusal to fix the tracks when they fell into disrepair in 1985, and accompanying cesser of use from that point; and (4) the railroad's April 9, 1986 application to the ICC seeking its approval of the abandonment and discontinuance of service over the Georgetown Branch.

Defendants assert that the acts proffered by Plaintiffs are not illustrative of abandonment, as a matter or law, because (1) the railroad tracks and ties remain—as had been a determinative factor in other cases where abandonment was found, *cf. D.C. Transit II,* 290 A.2d at 811–12; and that (2) the railroad's 1985 resolution did not indicate that railroad use would be altogether terminated, but rather, constituted the first step in the process of allowing another entity to assume responsibility for the line while retaining the option to abandon if the railroad later decided to do so; and (3) at the time of conveyance and recordation of the easement the

abandonment could not occur under state law unless it had been approved by the Maryland Public Service Commission, the appropriate regulatory board. *See* 1910 Md.Laws ch. 180, § 26, as added by 1914 Md.Laws ch. 445, § 1, *cited in Benson,* 118 A. 852–54 (1922).

Courts applying Maryland law in the context of easement abandonment have consistently held that abandonment is a question of intent. *See Read v. Montgomery County,* 101 Md.App. 62, 72, 643 A.2d 476, 481 (1994); *Peck v. Baltimore Cty.,* 286 Md. 368, 410 A.2d 7, 9 (1979); *Canton,* 57 A. at 638–39; *Vogler v. Geiss,* 51 Md. 407, 410 (1879). In *Vogler,* an 1879 landmark case involving the abandonment of an easement, the court set forth a test to determine the intent to abandon, which Maryland courts have used as a yardstick ever since. *Vogler,* 51 Md. at 410. The *Vogler* court instructed that to establish an intent to abandon, the party with the burden of proof must present evidence of "[A] cesser of the use, coupled with any act clearly indicative of an intention to abandon the right." *Id.* The court explained,

> [the] act or acts relied on ... must be of a decisive character; and while a mere declaration of an intention to abandon will not alone be sufficient, the question whether the act of the party entitled to the easement amounts to an abandonment or not, depends upon the intention with which it was done, and that is a subject for the consideration of the jury.

*Id.* The Maryland Court of Appeals explained in *DC Transit II* that the action necessary to produce abandonment of an easement "must be action in respect of its use which indicates an intention never to make use of it again." *DC Transit II,* 290 A.2d at 810 (citing 2 American Law of Property § 8.97 (A.J. Casner ed. 1952)).

Whether circumstances are sufficient to establish an intent to abandon must be decided on a case-by-case basis. *D.C. Transit II,* 290 A.2d at 811. While there is not one specific type of act that will qualify as the requisite act for purposes of the *Vogler* test,

Maryland courts have found that the tearing up of tracks (*DC Transit II,* 290 A.2d 807); failure to repair tracks or resume service and removal of track material accompanied by corporate resolution to abandon (*P.S.C. of Md.,* 89 A. 726); and the erection of permanent structures upon the tracks (*Vogler,* 51 Md. 407), had fulfilled this requirement.

As resolution of the abandonment inquiry requires a determination of intent, an issue of fact, it often cannot be made on summary judgment. *See e.g., Peck,* 410 A.2d at 9 (reversing grant of summary judgment on abandonment issue and remanding for retrial when street had been relocated from original easement as the intent of the parties was a material fact to be determined by factfinder). However, in the instant case, although the parties dispute the ultimate legal conclusion of whether an abandonment occurred, the material facts are agreed. Here, as in *Preseault,* the abandonment inquiry requires a factual conclusion based on inferences to be drawn from the undisputed evidence. As was pointed out in *Preseault,* "[n]othing would be gained by requiring a further proceeding at the trial level, since the parties had full opportunity to establish all relevant underlying facts. Trial would not enhance the court's ability to draw factual inferences and conclusions." *Preseault,* 100 F.3d at 1545–46; *see id* at 1553–54 (Rader, J. and Lourie, J. concurring) (parties did not show the existence of any disputed material fact).[24] The facts of this case are clear and lead to the ultimate legal conclusion that abandonment of the line by the railroad did occur.

In this case, the *Vogler* test for abandonment has been satisfied. The intent of the railroad to never make use of this right-of-way again has been evidenced by certain undisputed acts, (1) the railroad's application to the ICC for abandonment, (2) the railroad's opting to decline to fix the tracks when they fell into disrepair, and (3) the railroad's making arrangements with the two remaining shippers on the line to transport

---

**24.** *But see Peck,* 410 A.2d at 13 (*citing Fenwick Motor Co. v. Fenwick,* 258 Md. 134, 138, 265 A.2d 256, 258 (1970)) ("[e]ven where the underlying facts are undisputed, if those facts are susceptible of more than one permissible inference, the choice between those inferences should not be made as a matter of law, but should be submitted to a trier of fact.").

their goods by truck, as evidenced in the railroad's application to the ICC.

Service on the MSRR line continued from 1911 through 1985, but had decreased markedly by the early 1980's. *See* A–112–125. In 1983 the railroad posted notices along the line indicating that it intended to abandon the line by applying to the ICC in this regard within three years. On May 10, 1985 service on the Georgetown Branch was fully terminated due to the immediate need for major repairs to the trestle over Rock Creek, as well as repairs to other positions of the line. Subsequently, in June 1985, B & O passed a corporate resolution to abandon or discontinue service upon the railroad corridor and seek ICC approval to do so.

CCLC maintains that the passage of this resolution was the decisive act evidencing abandonment as required in *Vogler*. However, a close inspection of the resolution's text reveals that, although the document evidences that the railroad contemplated abandonment, it was not a definitive act of abandonment, but merely demonstrated the steps which would be indicative of an abandonment in the future.

The 1985 resolution provided,

RESOLVED, that this Company abandon or discontinue service over the following Georgetown Subdivision lines: ...

\* \* \* \* \* \*

(2) Discontinue service on that portion of the Georgetown Subdivision ... owned by Metropolitan Southern Railroad Company, in Montgomery County, MD, a distance of approximately 7 miles; and

\* \* \* \* \* \*

RESOLVED, that ... the execution of an application or notice of exemption to the Interstate Commerce Commission ... or, if appropriate, the execution of a petition for exemption to said Commission by Company counsel, in respect of any such abandonments and discontinuances, shall be conclusive evidence of such determination.

B & O Resolution of June 11, 1985, A–85 (emphasis added). As this language demonstrates, the railroad intended the filing of an ICC petition for abandonment or discontinuance to be "conclusive evidence" of such intent.

Minutes from an MSRR director's meeting of July 22, 1985 similarly show that MSRR ultimately sought to abandon the line. MSRR Director Minutes, July 22, 1985, A–87. They provide,

RESOLVED, that this company abandon, and its (sic) hereby consents to the Baltimore and Ohio Railroad Company's discontinuance of service on, that segment of its line of railroad, being a portion of the Georgetown Subdivision. ...

\* \* \* \* \* \*

... and the execution of an application or notice of exemption to the Interstate Commerce Commission ... in respect of any such abandonment, shall be **conclusive evidence of such determination.**

(emphasis added).

The separate references to the application for ICC approval to abandon and the actual abandonment determinations within both corporate resolutions show that the railroad bodies were cognizant of the distinction between an actual property law abandonment of the right-of-way (meaning an intent to not use it again) and the term "abandonment" meaning the federal, ICC–imposed regulatory hurdle. Reading of these resolutions in any other way would make them redundant and rob the statements that execution of an application would be "conclusive evidence of such determination," of any meaning at all.

Again, although they do not constitute acts indicative of abandonment in and of themselves, the resolutions are relevant because they explain the steps necessary to illustrate a future abandonment. Within these resolutions the railroad stated that an application to the ICC would be evidence of an abandonment. *See* Restatement of Property § 504(c) (Verbal expressions of an intention to abandon are relevant for the purpose of giving meaning to acts which are susceptible of being interpreted as indicating an intention to give up the use authorized by an easement, but which do not of themselves conclusively demonstrate the intention behind them.)

When the railroad then proceeded to submit this application on April 9, 1986, on behalf of MSRR, B & O, and its affiliates, it therefore acted in a manner indicative of abandonment. A–88–111, April 9, 1986 Application to ICC, ICC Docket No. AB–19 (Sub–No. 112). Further, within the application, the railroad stated explicitly, "[a]pplicants have not considered any alternative to the proposed abandonment." *Id.* at 98. Supporting this contention were additional actions by the railroad including leaving the tracks in disrepair and then diverting the line's two remaining shippers' deliveries to be transported by truck. See A–115, ICC Decision of February 28, 1988. Therefore, evidence of abandonment has been provided.

Defendants, attempting to show that the above does not constitute an abandonment, argue that the railroad could have filed for ICC abandonment and still planned to utilize the corridor for spur, side tracking, or intrastate uses, all uses not governed by the ICC. *See* 49 U.S.C. § 10907 (no authority over spur, side track, switching). Defendants have not presented any evidence in support of such intent.

Defendants also assert that the railroad had discussed the possibility of transferring the line to Montgomery County, and therefore did not intend to abandon, citing *KCT Railway Corp.—Abandonment Exemption—Franklin, Anderson, and Allen Counties,* KS, Dkt. No. Ab–335 (Sub–No. 2X), 7 ICC 2d 1035 (June 6, 1991) (ICC finds interest in negotiating trail use agreement inconsistent with intent to consummate abandonment). They point to minutes from a December 18, 1985 meeting in which CSX contemplated the sale of the property to Montgomery County:

> We will negotiate with Montgomery County for the transfer of the section of right-of-way between the District line and our main rail line north of Silver Spring for use as a transit-way or public bike path, in exchange for development rights of comparable value, either at selected air rights location along the right-of-way, or on other property to be traded for.

FDA–112. Defendants also point to the railroad's 1988 attempts to sell the line to Montgomery County as well as Laurel Sand and Gravel as illustrative of an intent to keep the right-of-way, inconsistent with an intent to abandon. However, efforts to sell the line subsequent to filing of the ICC application are not necessarily evidence of an intent to postpone abandonment. They equally likely could illustrate that the railroad realized that it would be subject to the rail-banking provisions.

■■■■ The fact that CSX had contemplated the possible sale of the right-of-way would not preclude abandonment under Maryland property law. In *P.S.C. of Md.,* 89 A. 726, the Maryland Court of Appeals concluded that a railroad had abandoned its railroad in 1897 with its cesser of use and accompanying acts, despite the fact that the railroad continued to be sold and transferred numerous times thereafter. This reasoning retains current validity because the termination of the uses for which an easement was granted may occur, and thus a state law abandonment, and yet a railroad may still intend to or actually sell the right-of-way during the period before the ICC grants the abandonment. Conversely, *KCT Railway,* contemplates the only the ICC–instituted abandonment, not state law property rights, and therefore the inferences drawn from negotiations for trail use are not relevant to the determination at hand.

Further, had the railroad sought to sell the property in 1986, and not to abandon, it could have done so under the appropriate statutes governing ICC practice. *See* 49 U.S.C. 11343 (transfer and purchase by other common carriers); 49 U.S.C. 10901 (common carrier status).[25] Or, it could have applied for a mere discontinuance. The facts of this case demonstrate that it chose not to take these alternate actions. Rather, the railroad sought abandonment and acted upon this intention.

Therefore, under the *Vogler* test, the railroad effected a state law abandonment. The *Vogler* test has been utilized as the sole inquiry by Maryland courts with respect to

---

**25.** In its 1988 contract with CSX, Montgomery County agreed to seek common carrier status under 49 U.S.C. § 10901 in the event it did not get certification under the Rails-to-Trails Act.

abandonments alleged to have been effected subsequent to 1910, even after state regulatory approval had been required by state law, and subsequent to 1920, when, by federal statute, federal approval supplanted state approval. *See e.g. D.C. Transit II,* 290 A.2d at 810–12; *Maryland & P.R. Co.,* 166 A.2d at 250–51 (abandonment found when service vacated, despite no appeal for any type of regulatory approval).

Defendants further point out that abandonment under Maryland law from 1910 onward required appeal and regulatory approval from a state commission, thus adding an extra step, under state law, before the lapsing of a right-of-way and the enjoyment of unencumbered title by the underlying fee owner.[26] With the passage of the Transportation Act of 1920, the federal government placed the state regulatory structure under the governance of the ICC. Defendants argue that ICC approval parallels prior Maryland Public Service Commission ("PSC") approval and is necessary in order to establish state law abandonment.

The enactment requiring state regulatory approval by the Public Service Commission is 1910 Md.Laws ch. 180. It provides that regulatory approval be subject to an inquiry into whether abandonment will suit the public needs. It provides,

No common carrier, railroad corporation, or street railroad corporation shall begin the construction of a railroad or street railroad, or any extension thereof, or **exercise any franchise or right** under any provision of the railroad law, or of any other law not heretofore lawfully exercised, **without first having obtained the permission** and approval of the commission. The commission shall have power to grant the permission and approval herein specified whenever it shall, after due hearing, determine that such construction or such exercise of the franchise or privilege

is necessary or convenient for the public service.

1910 Md.Laws ch. 180, § 26 (emphasis added).[27]

The Maryland Court of Appeals was faced with the task of deciphering the meaning of the phrase "necessary or convenient for the public service" in *Benson v. Maloy,* when citizens petitioned the court to overturn a Public Service Commission approval of abandonment, objecting to it based upon their need to utilize the railroad in question. *Benson,* 118 A. 852. The *Benson* court stated as follows:

What constitutes for a common carrier the elements which make the operation of the roads necessary or convenient for the public service? Suppose it be a single passenger a day, is he the public? If not, what other measure can be found by which to formulate the meaning to be given this expression? Manifestly from the adjudicated cases, **the only safe criterion in that regard is that which has heretofore been laid down by the court, the measure of which is the ability of the road from its earnings to meet its operating expenses and fixed charges,** to say nothing of any return whatever to the stockholders of the company.

*Benson,* 118 A. at 854 (emphasis added). The *Benson* court expanded upon the considerations of public interest weighing in favor not compelling the operation of a railroad which has deteriorated to a point where its continued operation would inevitably lead to catastrophe for which the railroad would not have the means to compensate any injured. *Id.* These pronouncements provide guidance as to what post–1911 PSC approval of abandonment in Maryland would require. However, this standard is not as rigorous as the one suggested by Defendant or applied by the ICC.

The ICC in 1988 conducted a parallel inquiry into public convenience and necessity and found that abandonment was proper.

26. Maryland courts applied the 1910 statute in the abandonment analysis when a right-of-way was created prior to 1910 and abandoned thereafter. *See Benson,* 118 A. 852.

27. This provision's specific application to abandonment was clarified in 1914 in 1914 Md.Laws ch. 445, § 1. ("The provisions ... empowering the commission to grant such permission and approval ... after due hearing .. shall likewise apply to the abandonment or discontinuance in whole or in part by any common carrier, railroad corporation....")

*See* A–112–125. To make the abandonment determination the ICC utilized the standard of *Colorado v. United States,* 271 U.S. 253, 268 (1926), and "... weigh[ed] the potential harm to affected shippers and communities from abandonment against the burden from continued operation on the railroad and interstate commerce,"—a higher standard than that adopted by the PSC in *Benson,* which looked less to the affected shippers and communities and more toward the financial state of the railroad. *See* A–118. Nevertheless, the ICC examined both issues of public ridership on the line and financial hardship, and still found abandonment appropriate, although it postponed its implementation as required by the Rails-to-Trails Act.

The ICC noted that the two remaining users of the railroad in 1985 had contracted with CSX to receive deliveries by truck which would have been placed upon the Georgetown Branch, and that no other party expressed a desire to use the railroad. *Id.* at A–115. The ICC also analyzed the financial condition of the line, and noted that repair of the railroad alone would cost some $573,000, use of the line had declined 91.1% from 1969–1985 and continued use of the line would cause CSX to incur significant opportunity costs. *Id.* at A–116. Upon these and other related based, the ICC concluded as follows:

> **The present and future public convenience and necessity permit abandonment by CSX of the line of railroad described above,** subject to (1) the employee protective conditions in Oregon Short Line R. Co.—Abandonment—Goshen, 360 I.C.C. 91 (1979); (2) the condition that CSX keep intact all the right-of-way, ... for a period of 180 days from the effective date of this decision to enable any State or local government agency or other interested person to negotiate the acquisition of the right-of-way for public use; and (3) the environmental and other conditions discussed above.
>
> **Abandonment of the line will not result in a serious adverse impact on rural and community development.**

*See* A–125 (emphasis added).

The only condition deferring actual abandonment on February 25, 1988 was the provision for the 180–day inquiry into Rails-to-Trails recreational and preservational uses as provided in the Rails-to-Trails Act. This inquiry into a possible sale for future railroad and recreational uses was simply not part of Maryland's Public Service Commission analysis. Further, the fact that CSX sought voluntarily to negotiate with purchasers under the 180–day CITU does not indicate that abandonment had not occurred. To the contrary, had state law and not federal ICC regulations governed this area, once the February determination had been issued, the right-of-way would have reverted.

Thus, to the extent the creation of the PSC in 1910 added an extra step to state law abandonment, state law abandonment still must be considered to have occurred. Abandonment under this rubric took place at the very latest on February 25, 1988—the date of the ICC order, because the order provided, at a minimum, the rough equivalent of the PSC abandonment authorization.

In conclusion, assuming that the railroad right-of-way was an easement, such an easement was, in fact, abandoned under state law. As abandonment did occur, it is not necessary to decide whether Montgomery County's intended uses of the corridor for a light-rail and hiker/biker trail are within any original right-of-way easement.

### 3. Taking

Again, as concluded above this case is appropriate for summary judgment at this juncture because by their 1911 deed, CCLC conveyed to MSRR a fee simple absolute interest. It has been determined that CCLC retained no residual interest in the land subsequent to this purchase. Therefore, there can be no taking of CCLC's property. *See e.g. Preseault,* 100 F.3d at 1549–52. However, had MSRR received only an easement in 1911, the absence of a Fifth Amendment taking would not be a foregone conclusion.

In asserting that a taking has occurred, CCLC states that it owned the fee simple absolute estate underlying the right-of-way property prior to its granting of an easement to MSRR—which was effected in 1891 and memorialized and recorded in the 1911 deed.

From 1911 through 1985, MSRR maintained the right-of-way for its railroad. At the latest, MSRR and its parent companies abandoned the right-of-way on February 25, 1988, and, if it is assumed that it was held only pursuant to an easement, the easement lapsed at that time. To the extent that Montgomery County now plans to physically possess this parcel and utilize it for a light-rail and hiker/biker trail, CCLC claims such physical invasion under these circumstances constitutes a taking of a new easement.

Relying largely upon *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), Defendants assert that no taking may be held to have occurred. They point out that in 1911—the year CCLC deeded the right-of-way to MSRR—CCLC could not have harbored any expectation of an abandonment of the right-of-way easement without the approval of a state regulatory body. *See id.* (antecedent inquiry with respect to expectations appropriate for *per se* taking). This, Defendants argue, is because Maryland statutory law enacted in 1910 placed the authority to approve abandonment within the ambit of a state regulatory agency, called the PSC. The necessity of application to and approval by this state-imposed regulatory regime, they assert, defined and diminished CCLC's expectation of gaining a full reversion of its property interest. Further, even if the Maryland state law did not create an environment in which postponement of abandonment could be effected for the particular purposes of trail or light-rail use, they contend that the state legislation injected basic background principles within the property interest of CCLC such that it generally could not expect a reversion and abandonment free of regulatory control.

 A taking may result from the denial of use of property as well as from taking of actual title and/or physical occupation of property. *See Lucas*, 505 U.S. at 1028–29, 112 S.Ct. at 2899–2901, 120 L.Ed.2d 798; *Chicago, R.I. & P.R. Co. v. United States*, 284 U.S. 80, 96, 52 S.Ct. 87, 92, 76 L.Ed. 177 (1931). The takings analysis was articulated by Justice Holmes' in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158,

160, 67 L.Ed. 322 (1922), where he stated "if a regulation goes too far it will be recognized as a taking." To facilitate decisions based upon this general statement of the law, courts have utilized a three-tiered approach in which a court weighs (1) the character of the governmental action, (2) the economic impact of the regulation, and (3) the extent to which that action interfered with the owner's legitimate, investment-backed expectations. *Penn Central v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), *cited in Babbitt v. Youpee*, —— U.S. ——, ——, 117 S.Ct. 727, 731, 136 L.Ed.2d 696 (1997). However, in two cases, this analysis is circumvented: (1) when regulation deprives property of all economic value—a confiscatory regulatory taking, and (2) when regulation results in a permanent physical occupation of land—a *per se* physical taking. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 102 S.Ct. 3164, 3170–71, 73 L.Ed.2d 868 (1982), *cited in Lucas v. South Carolina Coastal Council*, 505 U.S. at 1015, 112 S.Ct. at 2893.

 If it is assumed that MSRR did not acquire fee simple absolute title in the right-of-way, but rather a railroad easement, the facts of this case would then place it squarely within the *per se* physical taking category. First, the Rails-to-Trails Act would then provide for an easement upon property under the fee ownership of CCLC, which would allow for the physical invasion of this property by others. *See id.* Physical occupation is considered to occur both when there has been invasion of a fee interest as well as when there is occupation of an easement. *See Kaiser Aetna v. United States*, 444 U.S. 164, 180, 100 S.Ct. 383, 393, 62 L.Ed.2d 332 (1979) (occupation of a navigational servitude constitutes a physical taking); *United States v. Causby*, 328 U.S. 256, 265, 66 S.Ct. 1062, 1067–68, 90 L.Ed. 1206 (1946); *Portsmouth Co. v. United States*, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287 (1922).

 Second, the invasion qualifies as permanent within the context of takings jurisprudence. The term " 'permanent' does not mean forever, or anything like it," but rather, means an invasion that is not "transient or relatively inconsequential" as would amount

to "no more than a common law trespass...." *See Hendler v. United States*, 952 F.2d 1364, 1376–77 (1991), *cited in Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1582 (1993). Further, it does not require any particular individuals to station themselves permanently upon the premises. *See Nollan v. California Coastal Comm'n*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), *cited in Hendler*, 952 F.2d at 1377. In this case, the right-of-way corridor, pursuant to the Rails-to-Trails legislation, will continue to be physically occupied subsequent to when it would have been abandoned pursuant to Maryland law. Further, the occupation may continue indefinitely until rail service is again necessary, and may, hypothetically, resume subsequent to rail use, and continue in this loop forever. Such an occupation must be considered permanent.

Once a party has shown either a full confiscation of use of property or a permanent physical occupation, before a court may determine that a taking has occurred *per se*, an antecedent inquiry must be conducted into the existence of any possible "pre-existing limitations" upon the property involved. *See Lucas*, 505 U.S. at 1028–29, 112 S.Ct. at 2899–2901 (investigation into analytical framework for *per se* regulatory taking also discussed the framework to be utilized for *per se* physical takings).

The Court of Appeals for the Federal Circuit recently stated in *Preseault* in the context of another taking alleged to have resulted from the implementation of the Rails-to-Trails Act, that the factors which may place a pre-existing limitation upon a property right and preclude the finding of a *per se* physical taking, are those limitations which are found within state common law[28] prior to the creation of the property interest. The *Preseault* court defined that whether a *per se* physical taking has occurred therefore revolves around an antecedent inquiry of whether the legislation at issue (1) was enacted prior to the creation of the property interest at issue, and (2) has an effect which could not be anticipated under state common law as it existed at the time of creation of the interest. *See Preseault*, 100 F.3d at 1538–39 (citing *Lucas*, 505 U.S. at 1029–32, 112 S.Ct. at 2900–02).

However, the implications of this formulation of the antecedent inquiry with respect to the possibility of state or federal statutory law influencing a property right are not fully expounded by the *Preseault* court. *Preseault* merely presented the question of whether federal legislation passed subsequent to the creation of a property right inhered in the title owned by the Preseaults. The court answered this question by determining that state common law was the only discipline from which to draw background principles inhering in a property interest; and that state statutory law passed subsequent to the creation of a property interest could give rise to a taking. *Preseault*, 100 F.3d at 1543, *citing Lawson v. State*, 107 Wash.2d 444, 730 P.2d 1308 (1986) (*in banc*).

The Preseault court was not presented with the issue at hand in the instant case—whether a state statute enacted prior to the creation of a property interest will be considered to merge into and become a part of the common law for purposes of considering whether a taking of such property interest has occurred.[29] However, in *Lucas*, while

---

28. *Lucas* involved common law nuisance constraints placed upon property owners; however, other common law limitations on property owners may involve zoning or the police power of the state to protect public safety, health and morals. *See Hage v. United States*, 35 Fed.Cl. 147, 152 (1996) (citing *Bennis v. Michigan*, —— U.S. ——, 116 S.Ct. 994, 134 L.Ed.2d 68 (1996)).

29. Interestingly, the *Preseault* court apparently rejected the possibility that federal statutory law passed prior to the creation of a common law property interest would be factored into the background principles which may inhere in a subsequently created property right. *See Preseault*, 100 F.3d at 1539 (discussion of *California Housing Securities, Inc. v. United States*, 959 F.2d 955 (Fed.Cir.1992)). The court distinguished *California Housing Securities*, where it held a physical taking did not occur due to a lack of compensable property interest because of federal statutory regulation of the banking industry, because in that case the alleged taking was effected pursuant to a statutory enforcement action to punish prohibited conduct, an entirely different category of takings cases. This new category may encompass cases such as *Bowman v. United States*, 35 Fed.Cl. 397 (1996) (no taking when compensation alleged to be due for deprivation of property by forfeiture when forfeiture alleged invalid due to double jeopardy). *Cf. Scranton v.*

grappling with the issue of whether a property interest was informed by state nuisance law for purposes of the *per se* regulatory taking antecedent inquiry, the Supreme Court addressed the issue somewhat differently in its discussion of physical takings. It provided that the assertion of a pre-existing federal easement, as was at issue in *Scranton v. Wheeler,*—would not constitute a taking. *Scranton v. Wheeler,* 179 U.S. 141, 21 S.Ct. 48, 45 L.Ed. 126 (1900). The federal navigational easement was held to inhere in the title because it existed by a federal statute enacted pursuant to the Constitution's Commerce Clause.[30] Const. art. I, § 8. Thus, although *Lucas* does not directly discuss whether state or federal statutory law previously enacted affects prospective title, it recognizes that Constitutional concerns would affect title.

Under this formulation of physical takings law, it would seem, state legislation passed prior to the creation of a property right will be infused into the particular state's common law and will necessarily inhere in and limit the breadth of the possible property rights which may be established subsequent to each statutory enactment. This formulation has merit because it provides that property interests created prior to enactment of limiting regulation would be protected from its effects, yet, at the same time, legislatures would retain the ability to influence prospectively created property rights according to the evolving moral and practical needs of the times.[31]

Working within a system in which state statutes may merge into common law and inform the scope of property interests created subsequently, one must look at the combined state statutory and common law of the time of the creation of MSRR's right-of-way to determine whether there was an inherent limitation in the original state law which would obviate the possibility of a taking. If the state law as it existed when MSRR's right-of-way was created contained a pre-existing limitation regulating the reversion of the land in a like manner to the Rails-to-Trails Act, only then would the finding of a *per se* physical taking be precluded. If it is found that there was no pre-existing limitation, then a *per se* taking must be held to have occurred if it is assumed that CCLC retained title. *See e.g. Preseault,* 100 F.3d at 1550–52.

Central to the takings analysis is the inquiry into the date upon which the railroad right-of-way was created. *Preseault,* 100 F.3d at 1537–38. The right-of-way in this case was deeded to MSRR in 1911 and recorded in that same year—one year after 1910 state legislation created the PSC, the state regulatory board regulating railroad actions, including abandonment. Defendants contend that CCLC's reversionary property interest did not exist until the deed was granted, and that, as the 1910 statute creating the PSC preceded the creation of the property right, knowledge of such regulation must necessarily have informed such a reversionary interest. Maryland law has consistently required that property interests be recorded in order to be considered valid. *See United States v. Gallas,* 269 F.Supp. 141 (D.Md.1967) (rule in force at present first applied in Laws ch. 14 Acts of Assembly of

---

*Wheeler,* 179 U.S. 141, 21 S.Ct. 48, 45 L.Ed. 126 (Constitution may serve as basis for pre-existing limitation).

**30.** Considering the Commerce Clause as a pre-existing limitation would certainly lend a very broad interpretation of the background principles which could potentially limit one's property interest, perhaps so broad as to swallow up the *per se* taking rule altogether. Cases involving any federal regulation involving physical occupation such as *Hendler,* 952 F.2d 1364, could be categorized as involving pre-existing Commerce Clause limitations.

**31.** A rule which prohibited federal or state statutes from influencing and changing the common law and thus the realm of property interests prior to their establishment would freeze the State's common law as it existed perhaps either at the time of the creation of the United States, or even earlier, as it was under English common law as applied during colonial times. Such a characterization of common law as at one point constituting a static body of law is undoubtedly artificial. Over a century ago, in *Munn v. Illinois* it was explained, "the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances." 94 U.S. 113, 134, 24 L.Ed. 77 (1876).

1766, 1765–84 (1787)).[32]

Even crediting Defendant's contention that the interest was diminished by the 1910 statute, the 1910 law cannot be deemed to have so changed Maryland common law as to have created an environment in which abandonment regulation could objectively be expected to encompass a system in which Rails-to-Trails usage could inhere in CCLC's title such as to postpone reversion for the purpose of "railbanking"—preserving the rail corridor for future railroad use. Prior to 1910, railroads were created by legislatively required charters, and, likewise, abandonment was formally governed by the legislature. *See P.S.C. of Md.*, 89 A. at 727–28 (railroad may not be compelled to maintain its road if its charter simply authorizes its construction and maintenance). The Maryland Legislature possessed the power to at any time regulate, modify or change the control, use and estate of any rail road ... in such manner as it may deem equitable towards the said corporation and necessary to the accommodation of the public travel or use of the said rail road or rail roads. Md.Code, Corporations, § 71 (1859). Notwithstanding this state regulatory power, abandonment at the time was determined according to the common law test of *Vogler v. Geiss*, requiring intent to abandon and an act indicative of such intent. 51 Md. at 410.

In 1910, with the passage of a Md.Laws ch. 180, the PSC, a regulatory body, gained the ability to permit or deny abandonment. *See Benson*, 118 A. at 854–55. However, unlike the Rails-to-Trails Act, the 1910 statute contemplated the preclusion of abandonment only in cases where there existed at the time a public necessity for continued train service,

and where the provision of continued railroad service would not present financial hardship to the railroad company. *See id.* In this regard, the 1910 statute mirrored the above cited 1859 corporate provision.

The 1910 statute granted the PSC jurisdiction only over railroads for transportation purposes. It did not grant the PSC authority over any other actions that a railroad or the public might want to conduct upon a railroad right-of-way. In its jurisdictional provisions it granted the PSC authority over

> "... such portion of the lines of any other railroad as lie within this State ... so far as concerns the construction, maintenance, equipment, terminal facilities and local transportation facilities and local transportation of persons or property within the State."

1910 Md.Laws ch. 180, § 3(3). Further, in its "Applicability" provisions, it expressly provided, "this Act shall apply to the transportation of passengers freight or property from one point to another within the State of Maryland, and to any common carrier performing such service." 1910 Md.Laws 1910, ch. 180, § 12.

In contrast, the Rails-to-Trails Act's postponement of abandonment for public purposes includes (1) railbanking for future railroad purposes, as well as (2) use of a railroad right-of-way for non-transportation recreational purposes. These uses were simply not contemplated or even remotely foreshadowed in the 1910 law. When a party was granted a right-of-way on its property in 1911, the state law of the time had not developed to the point of including provisions for rail preservation that would cause rights-of-

---

32. The documentary evidence in this case shows that the right-of-way was actually created in 1891 with the Memo Agreement and building upon the right of way was commenced during that year. Further, construction of the entire right-of-way was complete in 1910 and train service commenced in that year. Therefore, any right-of-way easement was, de facto and by necessity at the very least, although not yet formalized by deed, in existence by the time the PSC regulation was enacted. In Maryland, a defective or unrecorded deed is considered effective as between the parties, and against third persons with actual notice. *Hudson v. Warner*, 2 H. & G. 415 (1828); *Columbia Hills Corp. v. Mercantile-*

*Safe Deposit & Trust Co.*, 231 Md. 379, 190 A.2d 635 (1963). Although this doctrine often serves to shield property owners against claims of title conflicting with their existing, albeit unrecorded, property rights, it would seem equally applicable in cases such as the instant one to be used offensively to establish the unfettered property interest required to prove a *per se* physical taking. Accepting this doctrine, a *per se* taking could be found without further analysis, because the 1910 law would be considered to have been enacted subsequent to the creation of the property interest, and therefore could not constitute a pre-existing limitation.

way to be utilized for hiker/biker trails and light-rail indefinitely until train service would again be necessary at some point in the distant future.

Thus, Maryland law as it existed in 1911 contained no pre-existing limitation upon abandonment akin to the limitation placed upon owners of fee simple interests underlying rights-of-way by the Rails-to-Trails Act. If it is assumed the right-of-way was held as an easement, state law abandonment would have occurred in the instant case at the very latest in February 1988 with the ICC determination. In 1911 any fee owner granting a right-of-way would have had no reason to expect that abandonment would be postponed for Rails-to-Trails purposes. As such, if it were to be held that the MSRR right-of-way was conveyed as an easement, as was found to have occurred in *Preseault,* operation of the Rails-to-Trails Act in postponing the reversion of the right-of-way would have effected a *per se* physical taking of CCLC's property.

■ Moreover, even if abandonment had not occurred in the instant case, an issue is raised with respect to whether a taking still may have occurred if Montgomery County's plans to construct a hiker/biker trail as well as a light-rail upon the right-of-way are considered outside the original scope of the easement. Plaintiffs assert that a hiker/biker trail may not be considered to be within the scope of the original easement because the original easement was for railroad purposes, and therefore for transportation only. Defendants argue that under the doctrine of shifting public uses, the right-of-way is sufficiently broad in scope so that its use for a public recreational trail is not a violation of CCLC's rights as owner of the underlying fee estate. They maintain that the original right-of-way, if found to be an easement, could only be construed as an easement for general public purposes. As such, they contend that it is properly construed as including other public purposes besides the running of a railroad, including use as a hiking and biking trail. They assert, therefore, that no additional servitude would be placed upon the right-of-way as a result of Montgomery County's plans.

Again if it is assumed for the sake of argument that the right-of-way was conveyed in 1911 as an express easement, its scope would be governed by the intent of the parties as demonstrated by the relevant granting and incorporation documents. 5 Restatement of Property § 482 (American Law Institute 1944) (the extent of an easement created by a conveyance is fixed by the conveyance); Jon. W. Bruce and James W. Ely, Jr. The Law of Easements and Licenses in Land § 8.02[1], at 8–3 (rev.ed.1995).

In the instant case, three documents have been produced: (1) the MSRR charter; (2) the 1891 Agreement; and (3) the 1911 deed. The railroad's charter discusses the "form[ation of] a corporation for the purpose of constructing and operating a railroad in the County of Montgomery in the State of Maryland." The 1891 Agreement also contemplated railroad use of the right-of-way. According to the 1891 Agreement, MSRR would construct its "tracks from the Metropolitan Branch [of B & O railroad in Silver Spring] . . . to Connecticut Avenue extended from the District of Columbia, on or before the 31st day of August, 1891." MSRR also promised to give the land company the right to connect power houses by sidings to MSRR's tracks. In addition, on the same day the 1891 Agreement was executed, the parties executed a separate agreement in which MSRR granted CCLC half rates on transportation of railroad freight on the Georgetown Branch.

However, the deed makes no mention of the railroad's proposed actions or uses of the right-of-way. Indeed, the instrument contains language indicating that the 1891 Agreement was to be "mutually abrogated, cancelled and set aside." This matter raises an issue of construction—whether the 1911 deed was deliberately free from references to railroad use because the right-of-way might from that point onward be used for any public purpose, or whether the references in the earlier documents were considered by the parties as sufficient to proscribe the railroad use upon the right-of-way.

In any event, the statutory provisions in place at the time did not specifically restrict railroad companies to conducting only rail-

road transportation, contemplating public travel as well as general use. *See e.g.* Md. Code Corporations, § 71 (1859) (legislature may "regulate, modify or change the control, use and estate of any rail road constructed by such corporation, in such manner as it may deem equitable towards the said corporation and necessary to the accommodation of the **public travel or use** of the said rail road or rail roads") (emphasis added); 1882 Md.Laws ch. 231, § 1 ("Act to enlarge the Powers of Railroad Companies by authorizing them to transact Express and Telegraph business"); *see also* 1880 Md.Laws ch. 279 (B & O railroad powers enlarged—authorized to purchase the stock of other railroad companies, to aid such companies and to purchase or lease or operate other railroads and works facilitating commerce).[33]

Thus, considering the 1911 deed language together with the statutes in place at the time, assuming the right-of-way was an easement, it cannot be said that its scope was necessarily limited to railroad or transportation uses.

However, assuming that the easement was for railroad purposes, Defendants' contention that the doctrine of shifting public uses allows for any public use of the property without the addition of another servitude, is misplaced. The court in *Preseault* examined this issue as defendants in that case similarly alleged that a railroad right-of-way was permitted to be used for broad purposes as a result of a shifting public uses doctrine. *Preseault*, 100 F.3d at 1541–42. The *Preseault* court explained that an examination of the particular state's common law is necessary in order to determine if the shifting public use doctrine is applicable. *Id.*

■ Defendants in the instant case have not shown that the doctrine of shifting public uses is a part of Maryland common law. Rather, the case law regarding public easements in Maryland has taken a more narrow approach than Defendants suggest. Maryland has recognized that the scope of an easement may be adjusted or expanded to serve the easement's original purpose, so long as the change is consistent with the

anticipated terms of the original grant. *Baltimore County Water & Electric Co. v. Dubreuil*, 105 Md. 424, 66 A. 439 (1907); *see also* Richard R. Powell, 3 Powell on Real Property § 34.12[2] (Patrick J. Rohan ed., 1996). In Maryland, the rules of law applicable to public highways are generally applicable to railroads. *See e.g. Whalen v. Baltimore & O.R. Co.*, 108 Md. 11, 69 A. 390, 393 (1908). Additionally, Maryland courts have held that easements for public highways have permitted for new modes of "travel and transportation ... such as might arise in the ordinary course of improvement." *See Dubreuil*, 66 A. at 441. Applying this rule, Maryland courts, when confronted with the laying of electric railroad tracks upon a street or a horse railway, typically held that such construction was within the original grant of a highway easement. *See e.g. Lonaconing, M. & F. Ry. Co. v. Consolidation Coal Co.*, 95 Md. 630, 53 A. 420 422 (1902); *Green v. City & Suburban Ry. Co.*, 78 Md. 294, 306, 28 A. 626 (1894); *Koch v. North–Ave. Ry. Co.*, 75 Md. 222, 23 A. 463 (1892); *John Peddicord v. Baltimore, Catonsville & Ellicott's Mills Pass. Ry. Co.*, 34 Md. 463 (1871).

Yet, when confronted with the actual question of which uses were within the scope of a railroad easement, the courts have looked to whether the proposed use was within the use as anticipated in the grant of the easement. In *Potomac & Edison Co. v. Routzahn* the issue was whether the erection and maintenance of poles and wires for the transport of electric power was within the original electric railroad easement. 192 Md. 449, 460–62, 65 A.2d 580, 585–86 (1949); *see also Chesapeake & Potomac Telephone Co. v. Tyson*, 160 Md. 298, 153 A. 271 (1931); *Potomac Elec. Power Co. v. Wall*, 153 Md. 229, 137 A. 899 (1927); *Amer. Tel. & Tel. Co. v. Smith*, 71 Md. 535, 18 A. 910 (1889). It was held that if the poles and wires were not used to transport power for the benefit of the railroad, but rather to provide energy to the public as part of another commercial enterprise, that they would constitute an additional servitude. *Routzahn*, 65 A.2d at 585–86. Also in *Dubreuil* the Maryland Court of Appeals, when

**33.** Although B & O's powers were so defined in 1880, in light of the breadth of legislatively grant-ed railroad powers, the possibility of their expansion was certainly understood.

confronted with the issue of whether the placement of a water main in a public highway was an additional servitude, found that it was because the right to lay such pipes was not part of the original grant. 66 A. at 441–42.

Further, in *Peck*, the Maryland Court of Appeals also clarified that when a public highway servitude is ". . . used for a[n additional] purpose, even though of a public nature, which is not within the scope of the highway use for which the land was dedicated or appropriated, it is considered that the land is subject to an additional burden or 'servitude'. . . ." 410 A.2d at 12–13, (*citing* 3 H. Tiffany, The Law of Real Property § 926 at 600–02 (3d ed. B. Jones 1939)).

The principles gleaned from these cases govern the inquiry as to scope at issue in this case. Had the right-of-way been conveyed as an easement and not in fee simple absolute, and were it determined to have been conveyed expressly for railroad purposes only, Defendants could not rely upon a shifting public use doctrine to expand its scope.

In conclusion, if it were held that CCLC retained title to the property and it were assumed that the scope of MSRR's right-of-way was limited to railroad uses, to the extent that Montgomery County now plans to physically possess this parcel and utilize it for a light-rail and hiker/biker trail, such physical invasion would constitute a taking of a new easement for these uses, and result in a physical *per se* taking. *See Preseault*, 100 F.3d at 1550–52 (*citing Loretto*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868).

Were it assured that abandonment had not occurred, and that CCLC retained title, in all probability the scope of the MSRR easement which Montgomery County would then have obtained by quitclaim deed on December 16, 1988 is not sufficiently broad as to fully encompass the activities now contemplated for the property.

Further, as Montgomery County acted under the Federal Government's authority pursuant to the ICC's Certificate of Interim Trail Use in gaining possession of the right-of-way, the United States would be liable for the taking effected. *See id.* at 1551, *citing Hendler*, 952 F.2d at 1378–79 ("when the Federal Government puts into play a series of events which result in a taking of private property, the fact that the Government acts through a state agent does not absolve it from the responsibility, and the consequences, of its actions").

Consequently, if it is assumed, contrary to the conclusion reached in this case, that the right-of-way was transferred to MSRR as an easement and not in fee simple absolute, it follows that a taking would have occurred, and Plaintiff, CCLC would then be entitled to summary judgment in its favor.

## C. Taking Claim of the Columbia Country Club

### 1. Property Interest

The Columbia Country Club asserts in its motion for summary judgment that it possesses an interest in approximately 3.89 acres within the right-of-way at issue in this case. Pursuant to the doctrine of adverse possession, or alternatively, lost deed, the Club claims to have acquired fee simple absolute property interests prior to 1986 in a portion of the land abutting the tracks within the right-of-way. *See* CBA–36.[34] Second, the Club contends that it possesses three easements upon the MSRR tracks, as well as a fourth easement by prescription[35] crossing the width of the right-of-way, use of which commenced in 1962, providing for the alleged prescription to have occurred in 1982. CCC S.J.Mot. at 29; CBA–36. It is not entirely clear whether the Club asserts its claims of attaining adverse possession and easement rights against MSRR or CCLC. Within its submissions, the Club takes opposite posi-

---

34. Later in its pleadings the Club contradicts its earlier claim as embodied by its survey map, and contends that it has by adverse possession acquired ". . . all rights to the Strip, except for the actual tracks and the immediately adjacent land required to support those tracks." CCC Reply at 6.

35. The Club has asserted an easement by adverse possession, which is properly termed an easement by prescription.

tions that either CCLC or MSRR was the fee owner of the right-of-way up through 1986, and proffers alternate claims against each. *See* CCC S.J.Mot. at 3, 30–32, 44 (CCLC owned fee title and reversion after 1986); *but see* CCC Reply at n. 12 (MSRR was fee owner[36], or, alternatively, abandonment has not occurred; Montgomery County is currently in possession of easement, and fee title has not yet reverted to CCLC.)

Finally, the Club asserts that Montgomery County's assumption of the right-of-way constitutes an unconstitutional "legislative action" resulting in the "severe impairment" of the Club's 1909 contractual agreement with MSRR.

 In their cross-motions and opposition to the Club's summary judgment motion, Defendants differ with respect to the fee ownership of the right-of-way prior to 1988,[37] however, they concur in asserting that the Club cannot establish adverse possession for several reasons, the most salient of which being that the Club's use of the land pursuant to license agreement was neither hostile nor exclusive. They further assert that no easements were created either expressly or as a matter of law. Plaintiff, CCLC, has also tendered a cross-motion for summary judgment with respect to the Club's taking claim. However, to the extent this motion concerns claims between the two private parties it cannot be so addressed. *See Rolls–Royce Ltd. v. United States and United Aircraft Corp.*, 176 Ct.Cl. 694, 364 F.2d 415 (1966); *McPherson v. United States*, 2 Cl.Ct. 670 (1983) ("if the relief sought is against others than the United States the suit as to them must be ignored as beyond the jurisdiction of this court. . . .").

## A. Adverse Possession

 Adverse possession requires a period of twenty years to accrue. *See East Washington*, 223 A.2d at 603–04, *cited in Read*, 643 A.2d at 479. Under Maryland law the burden of proof with respect to a claim of adverse possession rests with the claimant. *See Costello v. Staubitz*, 300 Md. 60, 66–67, 475 A.2d 1185, 1188 (1984). To establish adverse possession, ". . . the possession must be actual, hostile, open, notorious, exclusive, under claim of title or ownership, and continuous and uninterrupted for twenty years." *East Washington*, 244 Md. at 294, 223 A.2d at 603–04 (1966), *cited in Read v. Montgomery Cty.*, 101 Md.App. 62, 68, 643 A.2d 476, 479 (1994). Each element of adverse possession must be present in order to establish this claim. *Hungerford v. Hungerford*, 234 Md. 338, 339–40 199 A.2d 209, 210–11 (1964).

 Once the above elements have been established, in order to succeed in a claim of adverse possession versus a public entity, such as a railroad, a party must also illustrate two additional elements: 1) that the parcels claimed were not acquired by the railroad through a public grant—meaning by an act of congress; and 2) that the land at issue had not been devoted to a public use. *Read*, 643 A.2d at 479.

The Club has asserted that adverse use began in 1909 with respect to the portions of the right-of-way adjacent to the land acquired by the Club in 1909, and adverse use of the final parcel began in 1962 on its fourth golf cart crossing west of Tee 2. Thus, the Club maintains that adverse possession of different parcels occurred as early as 1929, and as late as 1982, during the years when MSRR owned the right-of-way. As it has been determined that MSRR held title to the right-of-way in fee simple absolute since

**36.** The Club here states, "[i]t is significant that the Land Company required the Club to obtain written permission from *the Railroad alone* to cross the Strip as a precondition to purchase of the two parcels. If the Land Company believed then, as it now asserts, that it had a reversionary interest in the Strip, it would only have made sense that it would have entered into a similar crossing agreement with the Club. No such Agreement exists, and there is no indication from the available documents that it was ever dis-

cussed or contemplated." CCC Reply at n. 11; *see also* CCC Reply at n. 12 (no reversion occurred).

**37.** Although abandonment may have occurred as early as 1986, the date of the ICC order—February 25, 1988—approving abandonment subject to Rails-to-Trails provisions will be utilized as the abandonment date in discussing the Club's alleged property rights.

1911, the property interests asserted as against MSRR will first be addressed. The interests asserted under the assumption that CCLC held title to the right-of-way will then be discussed.

### 1. Case of MSRR Having Fee Title to Right-of-Way

#### a. Permission by License Agreement

■ In order to establish that possession is hostile for purposes of adverse possession, use of the land may not be pursuant to the license or permission of the owner. *Zimmerman v. Summers*, 24 Md.App. 100, 110–11, 330 A.2d 722, 729 (1975). Based on the facts presented, the Club has not established hostility as against MSRR. The license relationship has been defined as "a simple recognition that one who is on land with the permission of the landowner [38] cannot be committing a wrong as to such landowner— by definition, it is a permission to use land." 8 Thompson on Real Property, § 64.01(a) (1981). This permission can be revoked at any time. *Id.; See Zimmerman*, 24 Md.App. at 110–12, 330 A.2d at 729; *Condry v. Laurie*, 184 Md. 317, 320–21, 41 A.2d 66, 67–68 (1945).

■ In the instant case, the Club recognizes and offers as evidence a 1909 contract, by which MSRR granted the Club license and permission to cross over and upon the right-of-way in conjunction with the Club's use of the land it intended to purchase from CCLC as a golf course. The document provides that the Club ". . . contemplates the location and maintenance on a portion thereof of a golf course, . . ." and states that MSRR granted to the Club "**permission, license or privilege** . . . to go upon, over and across the said right-of-way, road-bed and tracks of said Metropolitan Southern Railroad Company. . . ." CBA–27, 28 (emphasis added). This language allowed the Club and its members, guests and employees to utilize

the right-of-way in conjunction with the parcels it was to buy in 1909.

The Club has not offered evidence of revocation or that the Club's possession turned adverse at any point prior to filing this suit. Consequently, to the extent this license gave the Club and its members and guests the right to utilize the right-of-way in conjunction with its golf course, this license remained in effect up through MSRR's relinquishment of its interest in the right-of-way. *See Hungerford*, 199 A.2d at 211. Even assuming Montgomery County has not reinstated the previous license, there can be no adverse possession because the Club's present, allegedly adverse use has not approached the 20–year minimum necessary to establish adverse possession.

#### b. Application of License

The 1909 license agreement certainly applied to use of the right-of-way adjacent to the parcels which the Club contemplated buying from CCLC in 1909. The question remaining is whether the license applied to crossing over and upon the right-of-way adjacent to the portions of the Club's golf course acquired in later years—1913, 1919 and 1940—and generally west of "Tee 2" on the golf course. See CBA–36.

In interpreting the import and extent of license agreements, it is considered that "[t]he rights of a licensee are fixed by the agreement creating the license, if there is one. If there is no agreement, or the agreement does not fix the rights of the parties with respect to the matter in issue then it becomes a question of the reasonableness of the expectations of the parties." 8 Thompson on Real Property, § 64.04(a) (1981), (*citing* Restatement of Property § 516 (1944)).

First, the license in this case conferred the right to cross over the tracks, as well as upon the right-of-way in general in accord with the

---

**38.** A license need not be granted by the landowner, it may also be granted by any party with an interest in land superior to the licensee. "A license, being a simple permission to enter land, may be extended by any person who has a right to be on the land even though that person's interest in the land may amount to less than fee simple ownership. . . . Thus, one who has noth-

ing more than a possessory interest in the land may give a license to another and the only effect of the granting of the license is that the licensee's presence on the land will not be a wrong as to the licensor." 8 Thompson on Real Property, § 64.02(a) (1981); *but see DC Transit I*, 270 A.2d at 800–01 (easement holder may not grant rights as against fee owner).

Club's purpose of utilizing its land purchased in 1909 on either side of the strip as a golf course. The permitted use was not limited to any specific portion of the right-of-way as only the part adjacent to the Club's 1909 purchase. Rather, the license agreement acknowledges that the Club "... **contemplates the location and maintenance on a portion thereof of a golf course, and that [MSRR] owns and maintains a right-of-way, road-bed and track running through and across the said land of the said Columbia Country Club,...**" CBA-27.

The license anticipates broad use by granting

"permission, license or privilege ... **to go upon, over and across the said right-of-way, road-bed and tracks of said Metropolitan Southern Railroad Company during the day time, and at such points thereon as may be hereafter agreed upon by the parties hereto in writing....**"

CBA-27, 28 (emphasis added). Subsequently, in the clause pertaining to the indemnification agreement and consideration between the parties, the text again refers to the Club's potential liability which might be accrued "... while [the Club was] using, crossing or upon said right-of-way, road-bed or tracks of the said Metropolitan Southern Railroad Company...." CBA-28.

Based upon these features of the license, it is reasonable to construe the agreement as covering use of the right-of-way touching upon any part of the golf course. This would comprise use of parts of the right-of-way adjacent on one or both sides to parcels acquired by the Club subsequent to the signing of the agreement—parts of the right-of-way including the crossings and landscaping to the west of tee #2 adjoining the parcels acquired from CCLC subsequently in 1913, 1919 and 1940.

In accord with this construction of the license agreement is evidence, in the form of a 1982 letter from the Club to CSX illustrating that the Club understood the agreement in this way. The letter states in pertinent part,

Upon further research of our corporate records, Mr. Spencer located an old agreement dated November 11, 1909 between the B & O and the Columbia Country Club. In view of this agreement, a new one will be unnecessary.

MC Opp.Exh. 4, July 8, 1982 Letter from J. Trotman to CSX. In this letter the Club concluded that the permissive license covered its entire usage of the right-of-way in 1982, meaning use adjacent to parcels bought subsequent to 1909. The Club has not offered evidence that its use increased since 1982.[39] Therefore, it is determined that the 1909 license agreement covered the Club's entire use of the right-of-way up through 1986.

### c. Recognition of Title

 Even had the license agreement not been entered or not covered the entire scope of the Club's use, the element of hostility necessary to adverse possession has not been established. To show the hostility essential to acquisition of title by adverse possession requires possession by claim of right, unaccompanied by any recognition, express or inferable, from the circumstances, of the real owner's right to the land. 4 Tiffany, Real Property, § 1142, (3d ed. 1972), *cited in Hungerford,* 199 A.2d at 211. Where the original entry and subsequent occupancy of land is pursuant to contract, or with the consent or permission of the owner, possession will not be considered hostile and may not evolve into title, unless the record owner has notice that the continuing possession is under a claim of right. *Hungerford,* 199 A.2d at 211, *citing Feldstein v. Segall,* 198 Md. 285, 81 A.2d 610 (1951); *Waltemeyer v. Baughman,* 63 Md. 200 (1885); *Armstrong v. Risteau,* 5 Md. 256 (1853). Moreover, an

---

**39.** The Club's recorded minutes from 1914 reflect that the board authorized one member at that time to enter into arrangements with the officials of the B & O railroad for the purpose of securing "right of way across their tracks," with the understanding that the railroad would not be held liable for accidents that might occur, *see* FDA 128–30, Minutes from May 20, 1914 (emphasis added); FDA 102, does not detract from the fact that the Club had already acquired a license from MSRR, B & O's subsidiary. It would appear that the Club sought a right of way, or easement, to supplement or perhaps, to supplant its previously granted license, because it already held and was certainly cognizant of its agreement with MSRR.

original permissive possession is presumed to continue. *Hungerford,* 234 Md. at 341, 199 A.2d at 211. Therefore, transition to adversary possession must be proven by affirmative evidence. *Id.*

 In addition to the language of the 1909 deed, the Club's subsequent actions even from just a few years after the Club's purchase, illustrate that the Club indeed realized that it had only a license and not an interest in land. Minutes of the Club's board of governors from 1914, subsequent to its acquisition of additional adjacent tracts of land in 1913, reflect that a Dr. Harban [a board member] was authorized to enter into arrangements with the officials of the B & O railroad "for the purpose of securing right of way across their tracks," and limiting its liability. FDA 128–30, Minutes from May 20, 1914; FDA 102. As the Club sought to acquire right-of-way over the tracks, the Club realized it did not have title.

Much later, in the 1980's, letters from Club counsel to CSX and CCLC with respect to its interest in all portions which it used of the right-of-way evidence that the Club recognized the title of other parties in the right-of-way. In its 1982 letter to CSX, the Club admitted that it had to secure right of passage at that late date, illustrating that it recognized MSRR or CCLC as the owner of the land. *See* MC Opp. Exh. 4. Again, in 1986, after MSRR had expressed its intent to seek to abandon its service on the right-of-way, counsel for the Club made numerous attempts to secure passage over the right-of-way and in doing so recognized the ownership of others. In February 1986 Club counsel wrote to CCLC, recognizing the possibility that CCLC had a reversionary interest in the right-of-way upon abandonment of service. SA–21, February 19, 1986 letter from K.W. Parkinson to CCLC. Then, in August 1986, counsel for the Club recognized CCLC's underlying title, by writing to CCLC requesting "to acquire ... its right of reverter for that portion of the right-of-way which transits the Club property." MC Opp. Exh. 3, Aug. 11, 1986 letter from K.W. Parkinson to CCLC.

Apparently aware of the possibility that CCLC might not have underlying title, in April 1986 Club counsel contacted CSX Transportation Company to secure continuing permission of passage over the right-of-way.

> [W]e ... are very much concerned about the rights of the parties related to the railroad right-of-way through the golf course.... We would like to explore all avenues so as to protect the beautiful golf course at the Club.

MC Opp. Exh. 5, April 18, 1986 letter from K.W. Parkinson to CSX.

This correspondence illustrates that the Club recognized CCLC's or MSRR's fee simple title to the land prior to the purchase by Montgomery County. If the Club had acquired title by adverse possession, it would not have sought to enlist others in protecting its interest. The act of asking for permission for use is evidence that use of land is not hostile or adverse. *See Zimmerman,* 330 A.2d at 729. Therefore, it is not possible for the Club to assert a valid claim of adverse possession over any portion of the right-of-way during the period from 1909 through 1988, the year when MSRR conveyed the right-of-way to Montgomery County by quitclaim deed. Additionally, as the essential element of hostility has not been established, inquiry into the public nature of MSRR's ownership and use of the right is not necessary. Further, subsequent to Montgomery County's acquisition of the right-of-way, twenty years have not passed, and thus, adverse possession against Montgomery County could not have occurred.

**2. Case of CCLC Title To Right-of-Way.**

 Assuming that MSRR acquired only an easement in 1911 and that CCLC owned the fee underlying the right-of-way, the Club still cannot establish adverse possession. Adverse possession may be established as against a non-public entity fee owner despite the existence of easements, including public easements to the county or state. *Desch v. Knox,* 253 Md. 307, 311, 252 A.2d 815, 817 (1969), *citing* 4 Tiffany, The Law of Real Property § 1141, (3d ed. 1939); *see Read,* 643 A.2d at 481. Nonetheless, the

Club's claim, similar to its claim against MSRR, fails for lack of hostility.

Although it asserts adverse possession, the Club has alleged and presented evidence illustrating the permissive nature of its entry upon and use of the right-of-way. First, the Club has asserted that CCLC granted the Club the right to use the land as a condition of the 1909 purchase. In support of this assertion, the Club points to an undated option document which illustrates this permission to cross over the railroad tracks as part of the contract and deed of sale of 1909 between the parties. Additionally, a broader permission to utilize the right-of-way is implicit in the deed which specially grants the two parcels for use as a golf course. The deed provides,

> "... the land and premises hereby conveyed shall only be used for the purpose of a Golf Course and Club grounds, ... [and CCLC] hereby covenants to warrant specially the property hereby conveyed, and to execute such further assurances of said land as may be requisite."

CBA–34.

The Club asserts that CCLC not only approved of the use, but actually encouraged the Club to strike the 1909 license agreement with MSRR in order to ensure that its use would go unhindered. The Club itself states in its summary judgment brief,

> "When CCLC deeded the future golf and country club land to CCC by the Deed dated November 22, 1909, it knew the land was to be used for a country club and golf course. In fact the deed required it to be so used. It also knew CCC required as a condition of purchase, free passage over the Strip and that such permission was being obtained in writing from the MSRR at approximately the same time, obviously as part of the same general transaction. CCLC and CCC never signed a written agreement permitting passage, presumably because they knew that such a right of passage was clearly implied and understood."

*See* CCC S.J.Mot. at 14.

 Where, as occurred in the instant case, a party enters into possession of land pursuant to the terms of an oral agreement, as alleged by CCC to have been entered with CCLC, the party cannot acquire title to the land. *Walsh v. McIntire,* 68 Md. 402, 13 A. 348, 351 (1888), *cited in Hungerford,* 199 A.2d at 211.

Additionally, as stated above, in its 1986 correspondence, the Club recognized that once the parcel was transferred, its rights to use could potentially be jeopardized. Considering these facts, adverse possession as against CCLC—under the assumption that CCLC owned the fee underlying the right-of-way—is precluded.

**B. Lost Deed**

 Further, neither fee title nor an easement may be established pursuant to the theory of lost deed. Lost deed is a presumption that a deed would have been passed to a party, or that the party was entitled to title, or that ancient title was passed and lost. 2A C.J.S. Adverse Possession § 317 (1972). The doctrine has been invoked in cases

> **where an ancient title deed has been lost, or where a fact is to be established which occurred at so remote a period that no contemporary is living to testify as to its existence.** It is justified by the infirmity of human nature, the difficulty of preserving muniments of title and the public policy of quieting title by supporting long and uninterrupted possession and use, and is founded on the consideration that **the facts are such as could not, according to the ordinary course of human affairs, occur, unless there was a transmutation of title to, or an admission of an existing adverse title in, the party in possession.**

*Id.* § 318 (emphasis added).

 Where there is undisputed evidence as to the origin of title, and the grant asserted is not consistent with such title, a lost deed or grant will not be presumed. *Hammond v. Ridgely,* 5 H. & J. 245, 264, 9 Am.D. 522 (Md.1821). Further, "... a grant will not be presumed when the possession [of the party asserting lost deed or grant] is explained by evidence showing that it was taken in virtue of some qualified interest or

estate, less than that of absolute title, ...." *Colvin v. Warford,* 20 Md. 357, 395 (1863).

■ In this case, the parties have provided actual deeds showing evidence of the conveyance of title to the right-of-way to MSRR. The Club took a lesser interest, a license, not a property interest. Additionally, all deeds conveying land from CCLC to the Club mark Club property boundaries as those of the railroad right-of-way—the 1909 conveyance as well as those of the smaller additional parcels from CCLC to the Club in 1913, 1919 and 1940. Further, the Club itself recognizes that the title was given intentionally to another party by alleging in its complaint,

> "[b]ut for the [intent of CCLC to convey the right of way to MSRR ... CCLC] would logically have included that bisecting [right of way] and conveyed it to CCC in fee simple together with the separated parcels of land acquired by CCC...."

Therefore, the doctrine of lost deed cannot be employed to salvage fee title or an easement for the Club.

## C. Easements

The Club alternatively asserts that it gained easements upon the right-of-way[40] pursuant to several theories, including estoppel, prescription, implication, necessity and lost deed. It has been determined that MSRR received fee simple absolute title to the right-of-way in 1911, and that MSRR granted a license to the Club that existed up until the date it transferred the right-of-way property to Montgomery County by quitclaim deed. Montgomery County has asserted that it has allowed the Club to "continue its use of portions of the right-of-way under the license.... [and] it has made accommodations for passage of golfers, golf carts and golf maintenance equipment." MC Opp. at 20 n. 5. It also assertedly has offered crossing to the Club consisting of underpasses connecting the north and south portions of

the golf course. MC Opp. at 20 n. 5. However, the extent to which crossing will be allowed or feasible is unclear, as is the time at which the tunnels will be constructed. Therefore, the possibility of the existence of easements will be explored.

### 1. Easement by Estoppel

■ The Club cannot prove that any licenses extended by MSRR or CCLC were converted into easements by estoppel. Under Maryland law licenses are not held to run with the land and therefore cannot develop into property interests. *See Baltimore v. Brack,* 175 Md. 615, 3 A.2d 471 (1939), *cited in Busada v. Ransom Motors, Inc.,* 31 Md. App. 704, 705–06, 358 A.2d 258, 259 (1976). In keeping with this doctrine, Maryland courts have held that licenses are revocable, whether or not they are executed by the expenditure of money by the licensee, and therefore they will not be held to exist under the theory of estoppel. *See Busada,* 358 A.2d at 259; *Brehm v. Richards,* 152 Md. 126, 132, 136 A. 618 (1927). Consequently, when the right-of-way at issue in this case was sold to Montgomery County, the Club's license was revoked and the only property interest the Club could obtain would be an easement existing subsequent to and independent of the license.

### 2. Prescription

■ Based upon the facts of the instant case a prescriptive easement cannot be established. "In order to establish an easement by prescription, it is necessary to prove an adverse, exclusive and uninterrupted use of the way for twenty years." *Condry,* 41 A.2d at 67 (1945).[41] To be adverse, the use must be without permission or license. *Clayton v. Jensen,* 240 Md. 337, 343, 214 A.2d 154, 158 (1965), *cited in Hoffman v. United Iron & Metal Company, Inc.,* 108 Md.App. 117, 136, 671 A.2d 55, 64 (1996). A license is a

**40.** Consistent with its assertion that it obtained the adjacent land by adverse possession, the Club has asserted that it has four easements over the actual tracks only. As the Club did not adversely possess any of the right of way land, for crossing to occur, easements spanning the entire width of the strip would be necessary.

**41.** Due to this required element of adverse user, an easement cannot be established both by necessity—where use is pursuant to implied permission—and by prescription, as the Club has attempted to establish. *Feldstein,* 81 A.2d 610, 614.

permission or personal and revocable privilege. *Sinclair Pipe Line Company v. United States,* 152 Ct.Cl. 723, 287 F.2d 175, 176–77 (1961), 287 F.2d at 177, *citing* Thomson, Real Property, Vol. I, § 318 (1939 ed.). An adverse use is "use of . . . the lands of another whenever one sees fit, and without asking leave. . . ." *Cox v. Forrest,* 60 Md. 74, 79–80 (1883).

■ As stated previously, the nature of the Club's use of the right-of-way was permissive up until Montgomery County's purchase in 1988. In addition, twenty years have not passed since Montgomery County acquired the right-of-way, and thus, prescription may not yet have occurred. *See Condry,* 184 Md. at 321, 41 A.2d at 67. Thus, either under a scenario where MSRR and then Montgomery County had fee title, or assuming arguendo that CCLC indeed owns the underlying fee—and did so all along—and that abandonment of the right-of-way and reversion have occurred, upon the agreed facts of this case, the Club cannot demonstrate easements by prescription.

### 3. Implication/Necessity

The Club alternatively asserts easements pursuant to both implication and necessity. The easement by necessity is a type of implied easement. There are three types of implied easements, one implied from prior use, another implied by designation on the plat of land within a subdivision and the third is an easement implied by necessity at the time of the conveyance. Cunningham, §§ 8.4–8.6, at 445–451. As the Club has not asserted or offered evidence of prior use, and the land at issue was not conveyed as part of a subdivision, the only type of implied easement which may apply to the facts at hand is the type arising out of necessity.

■ Through 1988 the Club enjoyed a license to cross the right-of-way; however such personal license does not negate an implied way of necessity. *See Feldstein,* 81 A.2d at 615. In cases where an easement of necessity is considered to arise at the time of conveyance, the granting of a license will merely defer the availability of the easement until the expiration or revocation of the license. *Id.* Moreover, unlike the license previously granted, an easement by necessity will run with the land. *Hancock v. Henderson,* 236 Md. 98, 202 A.2d 599 (1964).

■ The essential elements required to establish an implied easement of necessity are (1) a conveyance; (2) unity of title concerning the parcel containing the alleged easement and the parcel for which the easement is necessary prior to the conveyance; and (3) necessity for access existed at the time of conveyance to pass over the parcel with the alleged easement in order to use the other parcel. *Condry,* 184 Md. at 317, 321, 41 A.2d at 66, 68, *cited in Shpak v. Oletsky,* 280 Md. 355, 360–61, 369, 373 A.2d 1234, 1238–39, 1242 (1977); *Jay v. Michael,* 92 Md. 198, 209, 48 A. 61, 63–64 (1900); *Eliason v. Grove,* 85 Md. 215, 225, 36 A. 844, 846 (1897) (easement to use well on another's lot); 3 H. Tiffany, The Law of Real Property § 779 (3d ed.1939). Once necessity disappears, the easement expires. Elements factored into the necessity determination are the availability of other means of access to the property, and whether relocating an easement would present a cost unreasonable in relation to the entire cost of the property. *Beck v. Mangels,* 100 Md.App. 144, 160–61, 640 A.2d 236, 245 (1994).

Defendants have asserted that cases in which Maryland courts have contemplated easements of necessity have generally involved roads or pathways for ingress and egress, (*e.g. Greenwalt v. McCardell,* 178 Md. 132, 12 A.2d 522 (1940)), or utility pipelines (*e.g. Mitchell v. Houstle,* 217 Md. 259, 142 A.2d 556 (1958)), and that easements of necessity may not arise except under such circumstances. While it is true that none of the Maryland access cases have addressed a situation such as the one at hand, where access to another parcel of one owner's property in order to conduct one's business, the underlying policy and rules of construction they have developed throughout the years provide guidance.

■ The seminal Maryland case on easements by necessity, *Condry v. Laurie,* explains that the doctrine of easements by necessity is based upon public policy, which is favorable to full utilization of land and the

presumption that parties do not intend to render land unfit for occupancy. *Condry*, 41 A.2d at 68. Although easements by implication are generally looked upon with jealousy and are construed with strictness, *Condry*, 184 Md. at ˙321, 41 A.2d at 68, Maryland courts have been more lenient with respect to easements implied to have been granted to the grantee in a conveyance than those impliedly reserved for a grantor himself. *Shpak*, 373 A.2d at 1238 (*citing Slear v. Jankiewicz*, 189 Md. 18, 22, 54 A.2d 137, 139 (1947) *cert. denied*, 333 U.S. 827, 68 S.Ct. 453, 92 L.Ed. 1112 (1948)). Implied grants will be recognized when necessary to the reasonable enjoyment of the premises granted. *Beck*, 640 A.2d at 243–44 (citing with approval *George v. Phillips*, 642 S.W.2d 275 (Tex.App.1982)); *Dalton v. Real Estate and Improvement Co.*, 201 Md. 34, 46–47, 92 A.2d 585, 591–92 (1952); *Greenwalt*, 12 A.2d at 525 (reasonably necessary for the fair enjoyment of the property). Easements of reservation require strict, actual necessity. *Beck*, 640 A.2d at 243.

In other jurisdictions at approximately the same time as the 1909 conveyance between CCLC and the Club, ways of necessity have been recognized to permit access to other land belonging to the same person, when such intervening strip was conveyed for a railroad right-of-way. *See* 3 H. Tiffany, Real Property, § 793 n. 26 (3d ed. 1939) (citing *Cleveland, C., C. & St. L. Ry. Co. v. Smith*, 177 Ind. 524, 97 N.E. 164, 169 (1912); *Vandalia R. Co. v. Furnas*, 182 Ind. 306, 106 N.E. 401 (1914); *Pittsburgh, C., C. & St. L. Ry. Co. v. Kearns*, 58 Ind.App. 694, 108 N.E. 873, 875 (1915); *New York & N.E.R. Co. v. Bd. of R. Comm'ners*, 162 Mass. 81, 38 N.E. 27, 28 (1894); *Uhl v. Ohio River R. Co.*, 47 W.Va. 59, 34 S.E. 934, 935 (1899)). These easements were recognized in circumstances in which grantors of rights-of-way asserted that they impliedly saved for themselves easements by reservation—easements that courts are generally more reluctant to acknowledge than easements by grant. *See Beck*, 640 A.2d at 243; *Dalton*, 92 A.2d at 591–92; *Greenwalt*, 12 A.2d at 525.

 The instant case involves similar facts regarding the apportionment of a right-of-way, however it constitutes a mirror image of the conveyances of these scenarios in that the Club asserts an easement by implied grant. Here the Club was the grantee of the two non-connected parcels in 1909 and another party, CCLC, granted the land to the Club and in so doing is alleged to have impliedly granted easements˙ of necessity allowing passage across the right-of-way which it then owned. This is a scenario where a grantee asserts an implied easement. Considering that Maryland courts have voiced a less stringent standard regarding easements of necessity by implied grant, it would seem that Maryland law would permit the recognition of easements of necessity across the strip. This interpretation permits the full use of the land for its intended purpose, and is thus in keeping with the public policy of the state of Maryland. *See Condry*, 41 A.2d at 68.

Further, easements by necessity have been recognized in situations like the one involved in the instant case, in which a deed of conveyance provides that the land conveyed be used for a certain purpose, such as to operate a particular business or enterprise, and an easement over another parcel of land is necessary to carry out such purpose. *See* 3 H. Tiffany, Real Property, § 792 (3d ed. 1939), *cited in* Cunningham, The Law of Property § 8.5, at 448 n. 3. An easement by necessity may arise

> ... upon a conveyance of land ... by reason of a construction placed upon the language of the conveyance in accordance with what appears to be the necessity of the case ... in order that land conveyed, or sometimes, the land retained, may be properly available for use.

3 H. Tiffany, Real Property, § 792 n. 83. Among the examples of this construction are instances where mineral grantees have been entitled to build air shafts and water storage facilities, erect machinery and even to dump waste upon the grantors' land in order to conduct their businesses as was considered to be reasonably necessary. *Id.* at n. 84–88 (*citing e.g. Marshall Ice Co. v. LaPlant*, 136 ˙ Iowa 621, 111 N.W. 1016, 1019 (1907) (grantor of land adjoining pond for an ice business grants privilege to have use of water in

pond)). In the 1909 transaction between CCLC and the Club, the deed contemplated use of the two parcels for a particular purpose—as a golf course. Therefore, necessity to use land upon the right-of-way for the Club's intended purpose may be established upon the facts presented, as well.

As an easement connecting two pieces of land over a right-of-way in order to conduct a business may be established by necessity, it remains to be decided whether the Club has established on summary judgment the three elements of the easement by necessity. The Club has illustrated that the first two requirements for a necessity easement are present with respect to the land it received in 1909. It received the vast majority of its land pursuant to a 1909 conveyance, and at that time there had been unity of title between the golf course parcels and the right-of-way in CCLC. In 1909 CCLC still held fee simple absolute title to the right-of-way strip.[42] Subsequently, in 1911, MSRR acquired fee simple absolute title to the right-of-way, and thus there would be no unity of title between the additional portions of the golf club (conveyed to the Club in 1913, 1920 and 1940) and the right-of-way at the time of conveyance.

The final inquiry is whether reasonable necessity existed in 1909 and continues with respect to crossing the right-of-way. *See Condry*, 184 Md. at 317, 321, 41 A.2d at 66, 68. The Club has illustrated that at the time it acquired the golf course property, an easement of crossing was reasonably necessary to the use of the property as a golf course and for the Club to have access from the north to the south part of its property on either side of the right-of-way. The undisputed documentary evidence from that time reflects that the land lying to the north side of the property was not large enough to comprise the entire course, and therefore the south property was bought as well, and as the 1909 memorandum illustrates, passage between the two was a condition of the sale. *See* CBA–26. Additionally, the map illustrates no access on the sides of the golf course existed, and therefore, alternative passage was not available. *See* CBA–25, 25A, 36.

The papers filed by the Club indicate that Club members, guests and employees continue to cross the parcel on its designated paths because Montgomery County has not yet constructed its light-rail and hiker/biker trail on the right-of-way. However, the Club has not illustrated that necessity will be resurrected after Montgomery County completes this project—the very eventuality which is at the core of the Club's taking claim. *See Feldstein*, 81 A.2d at 615. The Club has illustrated through its documents that alternative passage around the golf course is unavailable,[43] and has recognized such in the affidavit of Thomas Clark. *See* CBA–54, 57–58.

As part of the construction of the light-rail and hiker/biker trail, Montgomery County has proposed the building of tunnels underneath the right-of-way for crossing. The county provides that within the Club area, the trolley will be raised approximately five feet to provide for golf cart underpasses allowing for movement between the greens north and south of the alignment.[44] The Club has asserted that the construction of the underpasses which Montgomery County proposes would cause "inconvenience of golfers, golf cars, maintenance equipment, etc.

---

42. Montgomery County asserts that MSRR received equitable title pursuant to the 1891 Memorandum Agreement, even though that document was never recorded. *See supra* n. 30 (recordation necessary to establish title; possible exception when unrecorded interest recognized is when contrary assertion made by one of parties to transaction).

43. On the western end of the golf course there is a public street (Newdale Road) lying to the north of the right of way, and there is a body of water (Chevy Chase Lake) lying to the south of the right of way. On the eastern end of the golf course,

the plat indicates that there is a forest (Columbia Forest). CBA–36.

44. Report of Maryland DOT of January 15, 1991. The report also provides, "[o]n the eastern edge of the Country Club, the tournament tee at holes Nos. 15 & 18, which are within the existing railroad ROW (right-of-way), must be relocated or abandoned. Greens at holes 14 & 17 must also be modified." Although the plan will require the Club to relocate certain tees, holes and greens, this does not inform the inquiry of whether the Club has easement by necessity for crossing.

being confined to a tunnel with its grades causing additional stress." This assertion does not establish that the proposed alternative to any overland crossing easements—in the form of underpasses—is not possible or is unreasonably expensive in relation to the cost of the property. Therefore, the Club has not established that the necessity required to resurrect any possible easement by necessity will not be obviated by Montgomery County's course of action in providing crossings. *See Beck,* 100 Md.App. at 160–61, 640 A.2d at 245. As such, the Club has not illustrated that its original license to use the right-of-way has been terminated or somehow limited, in order to give rise to an easement by necessity for the residual crossing needs of the Club. Further, if an easement by necessity were proven, its physical area would need to be determined—the amount of square footage as was necessary to provide sufficient crossing in 1909, the date of conveyance.

As the facts regarding the Club's assertion of a Fifth Amendment taking of an easement by necessity have not yet been developed to the extent necessary to present this claim, particularly since Montgomery County has not taken action to restrict access to the property, the Club's taking claim in this regard is premature at this juncture. As such, summary judgment with respect to the taking of any possible easements by necessity across the right-of-way in its favor is not appropriate. Rather, because sufficient facts were not alleged by the Club and because Defendant has shown there is presently no interest of the Club's which has been taken, summary judgment must be entered in favor of Defendants.

#### 4. Lost Deed

As discussed above, the concept of lost deed will not support a prescriptive easement because the deeds of conveyance of the right-of-way are extant and document conveyances to parties other than the Club. *See Hammond,* 5 H. & J. 245, 264, 9 Am.D. 522 (Md.1821).

#### D. Contract Clause

Finally, the Club asserts a constitutional claim premised upon the Contract Clause, which provides "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10. Relying upon *Allied Structural Steel v. Spannaus,* 438 U.S. 234, 240, 98 S.Ct. 2716, 2720, 57 L.Ed.2d 727 (1978), the Club asserts that Montgomery County's assumption of the right-of-way constitutes a "legislative action" which may potentially result in the "severe impairment" of the Club's 1909 contractual agreement with MSRR, and as such is unconstitutional.

*Allied Structural Steel,* a case involving legislation which adjusted the rights and responsibilities of contracting parties, provides that while the Contract Clause does not operate to obliterate the police power of the States, it does impose some limits upon the power of a State to abridge existing contractual relationships. 438 U.S. at 242–44, 98 S.Ct. at 2721–22. The contract at issue in this case, the 1909 license agreement between MSRR and the Club, was not impaired by way of any Rails-to-Trials caused "legislative action" on the part of Montgomery County, because once MSRR relinquished title to the right-of-way, the license contract ceased to exist.

License contracts are permissive by nature and do not run with the land—therefore they expire upon the sale of the land upon which the licensed use occurs. *See Brack,* 175 Md. 615, 3 A.2d 471, *cited in Busada,* 31 Md.App. at 705–06, 358 A.2d at 259. Further, they are terminable at the will of the grantor. That Montgomery County may have passed legislation to enable itself to buy and utilize this strip—as the Club points out—is irrelevant to the issue at hand. Once Montgomery County bought the right-of-way, MSRR's license contract expired and therefore no impairment could have occurred.

Therefore, the Contract Clause does not provide for any redressable property interest on the part of the Club. Montgomery County has, in effect, extended a license to the Club to utilize the right-of-way subsequent to its 1986 purchase, *see* MC Opp. at 20 n. 5, thereby permitting the continuance of the use to which the Club argues it is contractually entitled.

#### 2. Taking

Finally, the Club claims that once the light-rail and hiker/biker path are constructed and put to use, the right-of-way will be more heavily trafficked and it will be more difficult for Columbia to utilize its golf course, portions of which are alleged to be within the right-of-way. The Club maintains that this heavier burden, enabled by federal legislation—the Rails-to-Trails Act, will interfere with its intended and current use of its property. This, the Club asserts, amounts to a taking of property in contravention of the Fifth Amendment. The Club cannot establish the requisite property interest or reasonable expectations to be free of such regulation.

The first step in establishing a taking involves demonstrating a compensable property interest pursuant to state law. *Lucas,* 505 U.S. at 1030, 112 S.Ct. at 2901. As determined above, to the extent that the Club asserts a taking of its property within the right-of-way, the Club has not established any property interest within this corridor.

■ The only property interest which the Club may possibly establish within the right-of-way is a limited one—an easement by necessity. However, it has not and cannot yet do so because this interest is contingent upon Montgomery County's provision of crossing rights once its light-rail and trail project is completed. Montgomery County has offered such rights, so to the extent the Club asserts that they will be deficient or Montgomery County will not follow through, any claim in this regard is not yet ripe because the relevant facts surrounding any such claim have not yet unfolded. It is not within the purview of federal courts to decide controversies based on contingencies that have yet to ripen into eventualities. *See generally, Dames & Moore v. Regan,* 453 U.S. 654, 689, 101 S.Ct. 2972, 2991–92, 69 L.Ed.2d 918 (1981); *Hodel v. Virginia Surface Mining & Reclamation Assoc'n,* 452 U.S. 264, 304, 101 S.Ct. 2352, 2374–75, 69 L.Ed.2d 1 (1981).

■ The other property asserted to have been taken is the Club's adjacent golf course. *See* CBA–52, 54–59 (use of entire golf course,

including tees and greens within the right-of-way will be subject to a litany of "potential problems.") The Club asserts that the Rails-to-Trails Act's enabling of the right of way to be transformed into a conduit with a light-rail and hiker/biker path will place a heavier burden of traffic upon its parcels. The Club property is, however, just as mentioned—adjacent land, and not the actual right-of-way parcel which is regulated by the Rails-to-Trails Act. Damage caused to property adjacent to that subject to the complained-of legislation is not compensable. *See Lucas,* 505 U.S. at 1019 n. 8, 112 S.Ct. at 2895 n. 8 (while "landowner whose premises are taken for a highway" recovers in full while "landowner whose property is reduced to 5% of its former value by the highway" recovers nothing).

■ Were a qualifying property interest shown, to prevail, the Club would have to continue to prove that the federal regulation has interfered with this interest to the extent necessary to establish a taking. As stated above, under the Supreme Court's three-tiered analysis set forth in *Penn Central v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), the existence of a taking will hinge upon (1) the character of the governmental action, (2) the economic impact of the regulation, and (3) the extent to which that action interfered with the owner's legitimate, investment-backed expectations.

The Club cannot demonstrate the requisite expectations. The Club purchased the course in 1909, after having received a written license agreement from MSRR allowing for the crossing over and use of the right-of-way as necessary in conjunction with it. Now that Montgomery County plans to place a hiker/biker trail and light-rail upon the same right-of-way, the Club asserts that it will suffer a taking.

The Club describes its harm as follows:

A hiker biker trail will annually place 1.5 million public users in the heart of the Club's property in addition to light rail trolleys running as frequently as every six minutes. From approximately 1911 to 1985, the use of the right of way was

limited to passage of an infrequent, slow-moving freight train which seldom, if ever, interfered with the Club's use of its property. The County's proposed plans, with the approval and potential support of the federal government, so fundamentally alter and interfere with the historic and present use of the adjacent golf course and Club as to render them significantly diminished or totally impaired. Such a result should not occur.

Club Reply at 5.

The Club has not, however, shown that MSRR or CCLC agreed that MSRR would continue to use the line for its railroad in perpetuity. The line might possibly have been sold by MSRR and used for quite different purposes including a road, trail or whatever might suit the present owner.

Further, the Club has not shown that MSRR or CCLC guaranteed that use of the right-of-way would be limited to the assertedly slow, infrequent transportation of freight during MSRR's use of the line over the years. Montgomery County's uses of the right-of-way—including pedestrians and faster-moving trains—were not prohibited under the license agreements. The Club simply had no reasonable expectation that use of the right-of-way would remain as was contemplated in 1909.

Therefore, as the key component of the takings analysis cannot be satisfied, the Club's taking claim is not viable. Summary judgment in favor of Defendant, the United States, is therefore appropriate.

## IV. CONCLUSION

In accordance with the conclusions reached:

**IT IS ORDERED,** that final summary judgment shall be entered in favor of the United States and Montgomery County, **DE-NYING** all claims asserted against the United States by Chevy Chase Land Company and Columbia Country Club and **DISMISS-ING** any claims not asserted against the

United States as beyond the jurisdiction of the Court.